UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BUD LEE and CINDY LUNDMAN, as next friend and as natural parents of PATRICK LEE, deceased, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | CASE NO: 3:06-00108 |
| METROPOLITAN GOVERNMENT OF NASHVILLE/DAVIDSON COUNTY, TENNESSEE, CHIEF OF POLICE, RONAL SERPAS, Individually and in his official capacity, POLICE OFFICER JONATHAN MAYS, POLICE OFFICER JAMIE SCRUGGS, POLICE OFFICER CHRISTOPHER BROOKS, POLICE OFFICERS JOHN AND/OR JANE DOE 1-10, individually and in their official capacities, and TASER INTERNATIONAL, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE ALETA A. TRAUGER |
| Defendants. | ) | |

**TASER'S MOTION TO EXCLUDE THE TESTIMONY OF
PLAINTIFFS' WARNING EXPERT WILLIAM KITZES
AND MEMORANDUM OF SUPPORT IN POINTS AND AUTHORITIES**

**Table of Contents**

|      |                                                                                                                       | Page |
|------|-----------------------------------------------------------------------------------------------------------------------|------|
| I.   | INTRODUCTION AND EXECUTIVE SUMMARY.                                                                                   | 2    |
| II.  | FACTUAL BACKGROUND                                                                                                    | 3    |
|      | A. Kitzes' Background, Credentials, And This Assignment.                                                              | 3    |
|      | B. Kitzes' Work On This Case.                                                                                         | 4    |
|      | C. Kitzes' Opinion Related To Medical Causation Should Be Excluded                                                    | 5    |
|      | D. Kitzes Concedes: No Duty To Warn Without Actual Risk Of Injury                                                     | 6    |
|      | E. Kitzes' Unsupported Speculation Regarding TASER's "Knowledge" Of A Defect                                          | 7    |
|      | F. Kitzes' Leap: The Need To Warn (Differently) Regarding Alleged Respiratory Risks                                   | 7    |
|      | G. The Audience Of TASER's Training Materials And Warnings.                                                           | 8    |
|      | H. TASER Warnings And Training Programs To The Metro Police Department.                                               | 9    |
|      | I. TASER's Evaluation Of Hazards.                                                                                     | 9    |
| III. | THE TESTIMONY AND REPORT OF KITZES DO NOT MEET THE ADMISSIBILITY STANDARDS FOR EXPERT EVIDENCE UNDER FED. R. EVID. 702 AND *DAUBERT*. | 10   |
|      | A. Kitzes Is Not Qualified As An Expert By Knowledge, Skill, Expertise, Training, Or Education On The Issues In This Case. | 11   |
|      | B. Kitzes' Testimony Is Not Based Upon Sufficient Facts Or Data.                                                      | 12   |
|      | C. Kitzes' Testimony Is Not The Product Of Reliable Principles And Methods.                                           | 13   |
|      | D. Kitzes Has Not Applied Any Principles Or Methods To The Facts Of This Case.                                        | 15   |
| IV.  | CONCLUSION.                                                                                                           | 15   |

Defendant TASER International, Inc. ("TASER") moves the Court to exclude the proposed testimony of Plaintiffs' purported warnings expert William Kitzes, whose testimony fails to satisfy the threshold requirements of Fed. R. Evid. 702 and the admissibility standards of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). Critically:

(1) Kitzes does not possess the requisite knowledge, skill, education or experience necessary to testify as to the design, safety, and/or physiological effects of the TASER® X26™ electronic control device ("Device" or "TASER X26");

(2) Kitzes' opinions regarding the design, safety, and physiological effects of the TASER X26 are not supported by sufficient facts and data;

(3) Kitzes has failed to apply scientific principles and methods in arriving at his opinions, including failing to conduct any independent testing and failing to exercise the intellectual rigor and professionalism that experts in the relevant fields would ordinarily employ in deriving their conclusions; and

(4) Kitzes did not reliably apply a scientific methodology to the facts of this case.

To prevail on their failure to warn claims under the Tennessee Products Liability Act (the "TPLA"), the Plaintiffs must show a defective or unreasonably dangerous design under the expert reliability factors of Rule 702 and *Daubert*. Quite simply, the fact that Kitzes lacks the requisite expertise and supporting facts, data, and scientific process should preclude him from testifying in this matter.

# MEMORANDUM
# IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS'
# DESIGNATED EXPERTS[1]

## I. INTRODUCTION AND EXECUTIVE SUMMARY.

The credentials and testimony of Kitzes fail to satisfy the threshold requirements of Fed. R. Evid. 702 and *Daubert* standards for admissibility.

Kitzes, armed with a law degree and a few early years of his career at the Product Safety Commission, presents himself as a TASER "warnings" expert. However, in his analysis Kitzes relies almost completely on a TASER Safety Bulletin and his lay reading of some medical articles. Kitzes offers no alternatives to warnings and training he claims are deficient.

Kitzes' opinions are not relevant to the core issue in this case. Critically, Kitzes cannot opine that a different (allegedly more adequate) warning would, more likely than not, have prevented the incident in question.

Kitzes' opinions also fail to clear the *Daubert* reliability prong, as he has no prior experience with TASER Devices or law enforcement devices of any type. Though he is willing to criticize TASER's warnings for a fee, Kitzes has not – anytime in his career – prepared a warning for any law enforcement device. Further, Kitzes has no experience in relation to the target audience of the warnings at issue – law enforcement. Kitzes has <u>never</u> assessed what effect the warnings he thinks should be provided would have on law enforcement officers.

Plaintiffs' counsel has attempted to use Kitzes in a way that his expertise does not support, and Kitzes has not expressed – and cannot express – reliable opinions on core issues.

---

[1] The cited materials are contained in TASER's Global Appendix filed contemporaneously with its Motion for Summary Judgment. References to evidence indicate the source by exhibit and then the page and line reference in the Appendix, *e.g.*, (Ex. 43, p. 9:7-10:2).

2

## II. FACTUAL BACKGROUND

### A. Kitzes' Background, Credentials, And This Assignment.

Kitzes operates "Consumer Safety Associates" with his wife.[2] (Ex. 43, pp. 9:7- 10:2). Kitzes is a lawyer, but has never practiced law. (Ex. 43, pp. 11:20-12:8).

After graduation from law school in 1975, Kitzes took a full-time position with the then newly formed Product Safety Commission as "Legal Advisor to the Director of Section 15, Office of Product Defect Identification." (Ex. 43, p. 14:2-25). That position had not existed before, and the "legal" title was just because the then 24-year-old Kitzes had just received a law degree.[3] (Ex. 43, pp. 14:14-15:4).

According to Kitzes, as a newly-minted "legal advisor" to the Commission, he was included in a 1976 visit from Jack Cover and his attorney to discuss the "original incarnation" to TASER devices. (Ex. 43, p. 16:9-21). The purpose of the meeting was just to introduce the Commission to the product. (Ex. 43, pp. 16:22-17:1). Kitzes recalls that the Commission thereafter determined that it did not have jurisdiction. (Ex. 43, pp. 19:22-20:3, 21:7-13, 30:5-9). Kitzes cannot identify any determination by the Commission to date that it has jurisdiction over the TASER X26. (Ex. 43, pp. 20:18-22, 21:25-22:14).

Kitzes has never been involved in any case other than this one case involving electronic control devices (known as "ECDs"). (Ex. 43, p. 26:19-23). Prior to being contacted about this case, the only thing he knew about TASER Devices was based on his very limited contact with Cover through the Product Safety Commission in 1976 (one introductory meeting after which he

---

[2] Ninety percent (90%) of Kitzes' work involves litigation, and 90% of that litigation is for plaintiffs. (Ex. 43, p. 10:10-15).

[3] That position was not with the legal office of the Product Safety Commission. (Ex. 43, p. 24:9-13).

3

simply passed on information to the Commission's legal department); his discovery memorandum of the Consumer Product Safety Commission from 1985 on the Internet (though he was not with the Commission at that time); and what he has learned through the general media. (Ex. 43, pp. 27:6-33:24).

Kitzes' background is devoid of anything specific to ECDs or law enforcement tools or training of any type. (Ex. 43, pp. 26:19-33:24, 48:1-17). Kitzes has not done any writings on ECDs, peer-reviewed or otherwise. (Ex. 43, pp. 41:17-42:3). Kitzes has not done any research or studies related to ECDs from any manufacturer, other than what is described above. (Ex. 43, p. 42:4-11). Kitzes admits that he is not an expert on the scientific principles behind TASER Devices or the physiologic effects of the TASER Device on the human body. (Ex. 43, pp. 25:22-26:2, 43:10-45:25).

Kitzes has no medical, engineering, or law enforcement training or experience. (Ex. 43, pp. 45:21-46:25). Kitzes is not an expert in law enforcement, use of force by law enforcement, use of force options, or the training of law enforcement officers. (Ex. 43, pp. 46:20-48:17). He has not done any writing, research, or studies related to the safety training of law enforcement officers. (Ex. 43, p. 47:12-22). Kitzes has no expertise regarding excited delirium. (Ex. 43, pp. 47:23-25, 48:5-12).

### B. Kitzes' Work On This Case.

Kitzes was first contacted about this case by Plaintiffs' counsel in late 2007. (Ex. 43, pp. 37:10-38:11). Unlike other cases in which he has been involved, Kitzes was not asked to formulate any potential new warnings. (Ex. 43, pp. 38:19-39:24). Kitzes was simply asked to "evaluate the issues surrounding multiple continuous use and not to redefine or to rework the actual material." (Ex. 43, pp. 39:25-40:4).

4

Kitzes claims that he was asked to evaluate "safety communication and to look at the issues that from a notice standpoint were available to TASER and what information they had about dangers associated with the foreseeable use of the product and how that was communicated to the police department through training, through supplemental bulletins and whether or not that communication was effective based on their knowledge of the potential danger." (Ex. 43, p. 40:5-18).

Kitzes offers no substantive opinion regarding information available to TASER when it sold the Metropolitan Police ("Metro Police") the Devices at issue; he has done no scientific analysis; and he has no expertise that would allow him to evaluate the knowledge and practices of law enforcement officers.

### C. Kitzes' Opinion Related To Medical Causation Should Be Excluded

Kitzes agrees that the mere fact that someone dies in police custody does not implicate a TASER device in that death. (Ex. 43, p. 67:8-11). Kitzes, however, nonetheless takes a "where there is smoke there is fire" approach. He testified, "But if you've got 200 cases to look at and see if multiple applications were involved, if respiration, acidosis, whatever, it gives you the database to – to evaluate that." (Ex. 43, p. 67:11-15).

Kitzes points to the introductory language of an article summarizing literature about potential cardiovascular risks of TASER Devices to support an alleged duty to warn in this case (which does not involve any alleged cardiovascular risk). (Ex. 43, pp. 68:19-69:1). That article appeared in *The Journal of The American College of Emergency Physicians* and, Kitzes admits, does not suggest that TASER Devices cause ventricular dysrhythmias, which was the topic of the article. (Ex. 43, p. 68:1-9, 68:15-19). However, when asked, "How does this article show that TASER [ECDs] contributed to death?" Kitzes read from the article:

5

> According to published reports, the Taser has now been temporarily associated
> with the deaths of 120 individuals since 1999. In 17 of these coroners cited Taser
> as a cause, contributing factor or could not be ruled out.

(Ex. 43, p. 69:2-8). Kitzes admits that the article, which simply indicates that there is controversy, nonetheless claims that the article "shows the need to provide notice to the police departments of multiple use substantially increasing the risk." (Ex. 43, pp. 86:17-25, 87:1-3, 87:22-25). Tellingly, Kitzes denies that it would be important also to know the number of in-custody deaths involving excited delirium and acidosis when TASER Devices were not used. (Ex. 43, p. 67:16-25).

Kitzes ultimately admits that he will need to let the "scientific guys" sort out any conflicting studies related to respiratory failure or ventricular fibrillation. (Ex. 43, p. 82:6-14). Kitzes admitted that he has no knowledge of the state of peer-reviewed research on multiple exposures from a TASER ECD. (Ex. 43, p. 100:3-11).

### D. Kitzes Concedes: No Duty To Warn Without Actual Risk Of Injury

Kitzes relies upon the materials cited in his report to argue that multiple and continued exposures create a substantially higher-risk level of danger. (Ex. 43, p. 111:2-19). Kitzes agreed, however, that if there is no risk of injury, there is no duty to warn. (Ex. 43, p. 72:10-13). Kitzes agrees that there is no reason to warn about a risk that does not exist. (Ex. 43, pp. 44:8-16, 72:10-13). Quite simply, there "has to be a reason to write a warning or develop training." (Ex. 43, p. 45:6-10).

Kitzes further emphasized, "If there's no risk, there's no need for additional training." (Ex. 43, p. 83:3-5, 83:14-15). He testified, "You need to do things based on the knowledge of a potential danger. If there was no potential danger, then you don't need to do things." (Ex. 43, pp. 84:23-85:1).

6

### E. Kitzes' Unsupported Speculation Regarding TASER's "Knowledge" Of A Defect

Kitzes speculates – without support – that, at the time of the TASER Training Materials Version 10.0, TASER decided not to supply police departments with information regarding the danger of prolonged applications.[4] (Ex. 43, pp. 61:23-63:6). Kitzes alleges that the information in the TASER database of TASER-related incidents (based on information submitted to TASER) is "flawed, biased, censored, you know." (Ex. 43, p. 63:7-21). Kitzes claims that Rick Smith of TASER testified "about his knowledge of 200 cases of death in police custody where TASERs were used" (Ex. 43, p. 66:19-22, citing Smith Dep., Ex. 44, p. 97:12-15) and that Smith referenced a study indicating that repeated activation can cause impairment of respiration.[5] (Ex. 43, p. 66:22-67:1, citing Ex. 44, pp. 201:12-202:10).

In any event, Kitzes acknowledges that on August 26, 2005, less than a month before the incident with Lee, Metropolitan Police Sergeant Bob Allen notified the force stating that "each five-second trigger pull and shock is considered as a separate use of force and that continuous holding the trigger could cause death." (Ex. 43, p. 164:17-25; Ex. 17, p. 9).

### F. Kitzes' Leap: The Need to Warn (Differently) Regarding Alleged Respiratory Risks

Kitzes thinks that a warning about a threat of respiratory failure should have been included in TASER Training Materials Version 10.0 (released in 2003) and that the information that should have been included in the Training Materials was in TASER Safety Bulletin 10.0-4

---

[4] In making this allegation, Kitzes assumes a danger of prolonged applications exists, a conclusion that is outside of Kitzes' expertise. (Ex. 43, pp. 61:23-63:6, 63:22-65:4). Kitzes did not review any medical data other than what he cited in his report. (Ex. 43, p. 81:14-16).

[5] Kitzes confuses temporal proximity with causation. Further, Kitzes actually characterizes the cited "study" about which Smith as questioned. That report can be found at Ex. 34 (Report, Joint Non-Lethal Weapons Human Effects Center of Excellent, March 1, 2005, p. 19). The report presents hypotheses, not conclusions supported by human studies.

(released in June 2005). (Ex. 27; Ex. 43, pp. 77:1-15, 95:23-96:4; Ex. 45, p. 13:9-14; Dep. Ex. 1002, Ex. 50).

Kitzes emphasizes TASER's 2005 12.0-04 Safety Bulletin that indicated the multiple applications should be avoided and referring to the possibility of impaired breathing.[6] (Ex. 43, p. 69:22-72:4).

Kitzes talks out of both sides of his mouth. First, he claims that warnings in TASER Safety Bulletin 12.0-04 should have been included in TASER Training Materials, Version 10.0.[7] Then, he nonetheless quibbles with the Safety Bulletin: he questions the e-mailed dissemination of the information; thinks there should have been training within the Metropolitan Government of Nashville/Davidson County to make sure the information was presented; and thinks that the document should be "spaced differently," with graphics. (Ex. 43, pp. 89:6-24, 95:23-97:19). However, when asked about exactly what should have been done differently, Kitzes punted, saying, "I haven't redesigned their training materials. I haven't been asked to at this point." (Ex. 43, p. 91:5-8). Further, though Kitzes wants to generically criticize the training that the officers at issue received, Kitzes has no knowledge of the training that the officers received in relation to use of force. (Ex. 43, pp. 96:17-97:19).

### G. The Audience Of TASER's Training Materials And Warnings.

Kitzes has stated in conclusory fashion that the materials provided by TASER were misleading, though it is clear that the typical user of a TASER X26 is law enforcement personnel, a group with which he has no experience. (Ex. 43, pp. 38:19-42:9, 46:20-48:22). Further, Kitzes is not an expert on use of force. (Ex. 43, pp. 97:17-98:19).

---

[6] *See* Summary Judgment Brief for description of this Safety Bulletin.

[7] Please note that the Metro Police had both the Training Materials (Version 10.0, 11.0, and 12.0) and the Safety Bulletin long before the Lee incident. (*See infra*).

8

### H. TASER Warnings And Training Programs To The Metro Police Department.

TASER provides a current training CD/DVD and an Operating Manual with every Device it ships, and every TASER Device instructor receives a CD/DVD and a manual as part of the instructor training program. (Ex. 26, ¶14). When new Training Bulletins or training versions are released, TASER forwards the Training Bulletins and training CD/DVD to all currently certified instructors in its database (over 30,000). (*Id.* at ¶14). Instructors are also required to go to TASER's website (http://taser.com) within 72 hours prior to presenting a training program to ensure he/she has the latest training version and updates. (*Id.* at ¶14).

Prior to September 22, 2005, the Metro Police had instituted a formal TASER training program. (Ex. 45, pp. 8:20-9:17; 13:9-14). TASER provided the Metro Police with the Operating Manual and Training CD Version 10.0 with the purchased Devices and later (but before the Lee incident) Training Versions 11.0 and 12.0. (Ex. 23, 24, 28-30; Ex. 45, pp. 14:19-15:3; p. 24:1-7). These materials, and the numerous warnings contained in them, are outlined in TASER's summary judgment brief.

### I. TASER's Evaluation Of Hazards.

As a part of pre-market distribution, TASER evaluated the potential hazards associated with the use of the TASER X26. (Ex. 26, ¶29; Ex. 10, p. 10). Research has also been conducted to evaluate the benefit to society of the use of TASER Devices. (Ex. 10, p. 10). These potential benefits have been estimated to be as much as an 80% reduction in officer injuries, a 75% reduction in firearm deployment, and a 67% reduction in suspect injuries. (Ex. 10, p. 10; Ex. 16, pp. 2-8). Kitzes agrees that the gathering of data is important to any determination of product hazards, but does not present any hazard analysis himself. (Ex. 43, p. 24:6-8; *See e.g.* Ex. 17).

**III. THE TESTIMONY AND REPORT OF KITZES DO NOT MEET THE ADMISSIBILITY STANDARDS FOR EXPERT EVIDENCE UNDER FED. R. EVID. 702 AND *DAUBERT*.**

Fed. R. Evid. 702 permits experts to testify based on "scientific, technical, or other specialized knowledge" only if that knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Bureau v. State Farm Fire & Cas. Co.*, 129 Fed. Appx. 972, 975 (6th Cir. 2005) (unpublished) (quoting Fed. R. Evid. 702). In *Daubert*, 509 U.S. 579, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court announced the district court's role as "gatekeeper" and entrusted the court with the duty to ensure that all forms of expert testimony, not just scientific testimony survive scrutiny under Rule 702. *See Bureau,* 129 Fed. Appx. at 975 (holding that "[a]lthough *Daubert* specifically dealt with 'scientific' evidence, we have recognized that the 'gatekeeper' analogy is applicable to all expert testimony offered under Rule 702.") (internal citation omitted). The district court's gatekeeping role is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. If proffered expert testimony does not meet the requirements of *Daubert*, then it "must be excluded." *Hein v. Merck & Co.,* 868 F. Supp. 230, 231 (M.D. Tenn. 1994).

Rule 702 requires that expert testimony satisfy the following four requirements in order to be admissible: (1) the witness must be "qualified as an expert by knowledge, skill, expertise, training, or education"; (2) the testimony must be "based upon sufficient facts or data"; (3) the testimony must be "the product of reliable principles and methods"; and (4) the witness must "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Restated formulaically:

**Theory + Credential + *Facts* + Validation + Fit = Admissible Expert Testimony**

Expert testimony that fails to meet all of these criteria should be excluded, even when the exclusion of expert testimony is the deciding factor in determining the outcome of the case. *See Bickley v. Norfolk & Western Railway Co.*, 1999 U.S. App. LEXIS 13654 (6th Cir. June 15, 1999) (unpublished) (district court's summary judgment ruling affirmed because, after the exclusion of expert testimony, the Plaintiff was unable to produce enough evidence to allow the case to go to trial.) (Ex. 60).

It is the burden of the party proffering the expert testimony to establish admissibility of the expert witness testimony. *Best v. Lowe's Home Ctrs., Inc.*, 2008 U.S. Dist. LEXIS 45175, *4 (E.D. Tenn. June 5, 2008) (Ex. 61). Here, Kitzes takes great leaps of logic – assuming that a defect about which TASER needed to warn, ignoring key communications between TASER and the Metro Police, and assuming that some sort of different warnings or training would have resulted in a different outcome. The report and proposed report of Kitzes do not meet the standards of admissibility set forth in Fed. R. Evid. 702 and *Daubert*.

### A. Kitzes Is Not Qualified As An Expert By Knowledge, Skill, Expertise, Training, Or Education On The Issues In This Case.

Plaintiffs have the burden of establishing that Kitzes is qualified to testify on the issues in this case. *See Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir. 2000) (holding that a witness is not "an expert simply because he claims to be.") (internal citations omitted) (citing *In re Paoli RR Yard PCB Litigation,* 916 F.2d 829, 855 (3rd Cir. 1994) (overruled on other grounds)). Kitzes can offer opinions in this case only if his opinion has "a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. Further, "the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . ." *Daubert*, 509 U.S. at 589-590.

11

Kitzes may be qualified to address various products and industries, but not the one at issue here. Kitzes knows next to nothing about TASER Devices and nothing about the physiological effects of a TASER Device on a human being. Kitzes must bring to the Court relevant, specialized skill, experience, training, or education. The court does not examine "the qualifications of a witness in the abstract," but rather "whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997), cert. denied, 522 U.S. 817 (1997) (internal citation and quotation marks omitted).

Kitzes lacks necessary expertise and qualifications on various aspects of this case: the product, the industry, and the target audience, among others. Kitzes cannot testify regarding the physiological effects of a TASER Device and/or whether a different warning would have resulted in a different outcome. Kitzes does not have the required knowledge, skill, experience, training or education and, thus, is not qualified to render an opinion regarding the necessity or effect of the TASER Device warnings at issue.

### B.     Kitzes' Testimony Is Not Based Upon Sufficient Facts Or Data.

Kitzes cannot be allowed to testify in a vacuum, as Rule 702 requires that all expert testimony be "based upon sufficient facts or data." *Mikes Train House, Inc.,* 472 F.3d 398, 407 (6th Cir. 2006). Rule 702 requires that expert opinions not lie in "unsupported speculation." *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 529-530 (6th Cir. 2008).

Here, Kitzes considered outdated TASER Training Materials and failed to consider subsequent versions supplied to the Metro Police. Further, Kitzes did not base his opinion on any knowledge of law enforcement training generally or specifically, or on any expertise related to law enforcement tools. Further, as addressed below, in forming his opinion, Kitzes relied on insufficient data and information and did not use a reliable scientific methodology.

### C. Kitzes' Testimony Is Not The Product Of Reliable Principles And Methods.

To withstand scrutiny under Rule 702, *Daubert* teaches that expert testimony must be both reliable and helpful. *Daubert*, 509 U.S. at 589; *see also Surles v. Greyhound Lines, Inc.,* 474 F.3d 288, 295 (6th Cir. 2007) ("Daubert and its progeny" have charged district courts "with evaluating the relevance and reliability of proffered expert testimony with heightened care."). For expert testimony to be reliable, the district court must look not at "the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert* II").

Reliable expert testimony also must be helpful. *See Daubert*, 509 U.S. at 591 (Expert testimony that "does not relate to any issue in the case is not relevant, and is "non-helpful."). Additionally, conclusory statements do not help the trier of fact. *Woodhull v. County of Kent*, 2006 U.S. Dist. LEXIS 54028 (W.D. Mich., Aug. 3, 2006) (internal citation omitted) (Ex. 62). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. "The use of 'science' to explain how something occurred has the potential to carry great weight with a jury," which explains why "the trial judge plays an important role as the gate-keeper in monitoring the evidentiary reliability of such testimony." *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 920 (11th Cir. 1998). "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States v. Frazier,* 387 F.3d 1244, 1263 (11th Cir. Ga. 2004).

Expert testimony must involve a scientifically valid reasoning or methodology underlying the testimony, and that reasoning or methodology must be able to be properly applied to the facts in issue. *Daubert*, 509 U.S. at 592-93. The flexibility of the Daubert inquiry "gives the district

13
Case 3:06-cv-00108 Document 275 Filed 10/15/08 Page 15 of 20 PageID #: 3403

court the discretion needed to ensure that the courtroom door remains closed to junk science, while admitting reliable expert testimony . . . that will assist the trier of fact." *In re Welding Fume Prods., Liab. Litig.*, U.S. Dist. LEXIS 46164 (N.D. Ohio, Aug. 8, 2005) (internal citation omitted) (Ex. 63). The trial court "must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 (advisory committee notes, 2000 amendments). "[A]ny step that renders the analysis unreliable … renders the expert's testimony inadmissible." *EEOC v. Ethan Allen, Inc.,* 259 F. Supp. 2d 625, 634 (N.D. Ohio 2003) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir. 1994) (overturned on other grounds). "This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id*.

The *Daubert* Court provided the district court the following factors for determining whether scientific testimony is sufficiently reliable to be admissible: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

Kitzes' "analysis" is simple and unhelpful: he blindly assumes TASER Devices can cause respiratory failure through metabolic acidosis; he ignores the full range of warnings and communications from TASER to the Metro Police; and he criticizes TASER's materials, offering no alternative. Kitzes has done nothing to test his opinions or approach. And he cannot say, to any degree of certainty, that any different warnings would have prevented Lee's death.

Finally, Kitzes clearly developed his opinions expressly for the purposes of testifying. *Daubert II,* 43 F.3d at 1317. This Circuit has noted that it is "suspicious of methodologies

14

created for the purpose of litigation, because expert witnesses are not necessarily always unbiased scientists." *Mike's Train House, Inc.,* 472 F.3d at 408 (internal quotations omitted) (citing *Turpin v. Merrell Dow Pharms., Inc.* 959 F.2d 1349, 1352 (6th Cir. 1992)). "[A] scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Daubert* II, 43 F.3d at 1317; *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("[T]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.").

### D. Kitzes Has Not Applied Any Principles Or Methods To The Facts Of This Case.

Not only has Kitzes not addressed reliable principles and methods (a scientific process), but he has not applied this to the facts of this case. Clearly, a district court must determine whether Kitzes' "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. 592-93; *see also Daubert II,* 43 F.3d at 1316 (the proposed expert testimony must be "relevant to the task at hand."); *Surles v. Greyhound Lines, Inc.*, 474 F.3d at 295 ("The gatekeeping inquiry is context-specific and must be tied to the facts of a particular case.") (*citing Kumho Tire*, 526 U.S. at 150) (internal citations omitted).

A linkage between principles and methods to the facts of this case is impossible to identify with Kitzes. Further, Kitzes does not understand the facts of this case: (1) not the product; (2) not the industry; (3) not the audience; (4) not the medical, electrical and scientific evidence; and (5) not the specific warnings.

### IV. CONCLUSION.

Plaintiffs carry the burden of establishing that Kitzes' testimony and report meet the required element of admissibility under Fed. R. Evid. 702 and *Daubert*. Plaintiffs cannot meet this burden. Kitzes does not satisfy the reliability standards for scientific knowledge in that he

does not have sufficient knowledge, skill, experience, training, or education to testify regarding the cause of Lee's death, regarding warnings at issue or those allegedly required for law enforcement personnel, or about the necessary causation link. His methods and opinions are unreliable and not based on sound science, and his opinions are not supported by sufficient facts and data. He completely failed to exercise the intellectual rigor and professionalism that an expert in the relevant field would ordinarily employ in deriving his conclusions. Finally, Kitzes fails to apply his purported methodology reliably to the facts of this case. As such, Kitzes must be precluded from testifying in this matter.

WHEREFORE, TASER respectfully requests that the Court exclude Kitzes from testifying in this matter.

Respectfully submitted,

_s/John R. Maley_
John R. Maley
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
E-mail: jmaley@btlaw.com

Kathleen M. Anderson
BARNES & THORNBURG LLP
600 One Summit Square
Fort Wayne, Indiana 46802
Telephone: (260) 425-9440
Facsimile: (260) 424-8316
E-mail:kanderso@btlaw.com

Brigid M. Carpenter
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.
211 Commerce Street, Suite 1000
Nashville, Tennessee 37201
Telephone: (615) 726-7341
Facsimile: (615) 744-7341
E-mail: bcarpenter@bakerdonelson.com

Attorneys for Defendant,
TASER International, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2008, a copy of the foregoing was electronically filed with the Court and served on the following counsel of record via the Court's electronic filing system:

Joe Bednarz, Jr.
Joe Bednarz, Sr.
BEDNARZ & BEDNARZ
Suite 1400 Parkway Towers
404 James Robertson Parkway
Nashville, Tennessee 37219

Brigid M. Carpenter, Esq.
BAKER, DONELSON, BEARMAN, &
BERKOWITZ, P.C.
211 Commerce Street, Suite 1000
Nashville, Tennessee 37201

William R. Willis, Jr.
Tyree B. Harris, IV
WILLIS & KNIGHT
215 Second Avenue North
Nashville, Tennessee 37201

Lawrence Alan Poindexter
ROCHELLE, MCCULLOCH & AULDS
109 Castle Heights Avenue, North
Lebanon, Tennessee 37087

John M.L. Brown
222 Second Avenue North, Suite 312
Nashville, Tennessee 37201

Alison L. Bussell
Keli J. Oliver
Metropolitan Department of Law
222 Third Avenue North, Suite 501
Nashville, Tennessee 37201

Aubrey B. Harwell, Jr.
William T. Ramsey
James G. Thomas
NEAL & HARWELL, PLC
150 Fourth Avenue North, Suite 2000
Nashville, Tennessee 37219

Thomas T. Overton
213 Third Avenue North
Nashville, Tennessee 37201-1603

Jack L. Byrd
Jessie Ray Akers, Jr.
1161 Murfreesboro Road
Suite 430
Nashville, TN 37217

                                               *s/John R. Maley*
                                               John R. Maley

FWDS01 233470v1