# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BUD LEE and CINDY LUNDMAN, | ) | |
| as next friend and as natural parents of | ) | |
| PATRICK LEE, deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:06-0108 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| METROPOLITAN | ) | |
| GOVERNMENT OF NASHVILLE | ) | |
| AND DAVIDSON COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

A substantial number of motions are pending before the court in this case, which concerns a police altercation involving tasers and the subsequent death of a twenty-one-year-old man outside of a Nashville, Tennessee nightclub on September 22, 2005. First, all ten police officer-defendants in this case have moved for summary judgment. Five officer-defendants (Fisher, Mays, Pinkelton, Scott, and Wright) have moved for summary judgment in one motion (Docket No. 232), and the other five officer-defendants (Cregan, Mallery, Smith, Scruggs, and Brooks) have moved for summary judgment via their own, independent motions. (Docket Nos. 241, 248, 255, 272, and 309, respectively.) Additionally, Cregan, Mallery, and Smith have moved to dismiss the plaintiffs' state-law negligence claim (Count IX) as to them. (Docket Nos. 238, 245, and 252, respectively.) Further, Fisher, Mays, Pinkelton, Scott, Wright, and Brooks have filed motions to exclude two of the plaintiffs' proffered experts, Ernest Burwell and Roger Clark. (Docket Nos. 221, 223, and 308.) Also, Fisher, Mays, Pinkelton, Scott, Wright, Brooks,

1

and Scruggs have filed a motion to strike various documents filed by the plaintiffs in the course of summary judgment briefing, a motion joined by defendant Metropolitan Government of Nashville and Davidson County ("Metro"). (Docket Nos. 411, 413, 427, 438, and 442.) Metro has also moved for summary judgment. (Docket No. 279.)

Defendant Taser International, Inc., ("Taser") has filed a motion for summary judgment (Docket No 259) and motions to exclude the plaintiffs' proffered causation experts and failure-to-warn expert. (Docket Nos. 275 and 289.) Finally, Taser has filed its own motion to strike various documents that the plaintiffs filed in the course of their summary judgment briefing. (Docket No. 436.) For their part, the plaintiffs have filed a motion to re-open discovery and to compel as to Taser (Docket No. 414) and a motion for leave to manually file CDs. (Docket No. 447.)

For the reasons discussed below: (1) the motions to dismiss of Cregan, Mallery, and Smith will be granted; (2) the summary judgment motions of seven individual officer-defendants (Fisher, Pinkelton, Scott, Wright, Brooks, Mallery, and Smith) will be granted, and the summary judgment motions of the other three officer-defendants (Mays, Scruggs, and Cregan) will be granted in part and denied in part; (3) the officer-defendants' and Metro's motion to strike will be denied as moot, along with the plaintiffs' motion to manually file CDs; (4) the motions to exclude Burwell and Clark will be denied; (5) Metro's motion for summary judgment will be granted in part and denied in part; and, finally, (6) Taser's motion for summary judgment will be granted, its remaining motions denied as moot, and the plaintiffs' motion to re-open discovery and to compel denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the death of twenty-one-year-old Patrick Lee, who died following an altercation with Nashville police officers outside of the Mercy Lounge nightclub in Nashville, Tennessee on September 22, 2005.[1]

### A.     The Incident

On the night of the 22nd, Lee was attending a concert at the Mercy Lounge, and owners of the club asked Lee to leave for repeatedly getting too close to the stage and generally acting strangely in the club.  Once Lee was removed from the club, club owner Chark Kinsolving and a bouncer known as "Big Rob" tried to talk to Lee and move him away from the club.  During this interaction, Lee acted strangely, laughing and yelling incoherently, flipping his shoes off and then putting them back on, talking about the sky, and walking in circles, among other strange, but not aggressive, behavior.  After repeated efforts to get Lee to leave the area around the Mercy Lounge, Kinsolving became tired of Lee's antics and called the Metro Nashville Police Department and asked them to send an officer out to help with Lee's removal from the premises.

The first officer to arrive on the scene was officer-defendant Brooks, who arrived shortly after 11:30 p.m.  Brooks and his civilian rider pulled up to the scene and were immediately approached at their car by Lee, who was in front of the club.  Brooks got out of his car and asked Lee what was going on, and Lee pointed to the sky.  When Brooks again asked what was going

---

[1]Unless otherwise noted, the facts are drawn from the parties' various statements of material facts (Docket Nos. 234, 243, 249, 257, 274, 284, 291, 310, 359, 362, 370, 373, 375, 376, 378, 379, 380, 398, 399, 404, 405, 406, 422, 429, 433, 435, and 444) and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

3

on, Lee kneeled down and pointed to the ground. Brooks asked for identification, which Lee

provided. Lee continued to act strangely, however, stating that his name was "Blue." After this,

Lee began walking toward Brooks. Brooks held out his arm indicating that Lee should stop, but

Lee walked into Brooks' hand. In response, Brooks asked Lee to put his hands behind his back,

which Lee did. But, when Brooks' hand touched Lee's hand, Lee reacted, jerking away, turning

around, ripping his shirt off and moving toward Brooks. Perceiving these maneuvers as

aggressive, Brooks pepper-sprayed Lee. After he was pepper-sprayed, Lee began running away

from Brooks, back into the parking lot of the club, with Brooks in pursuit. Lee disregarded

Brooks' repeated commands to get on the ground. During this "chase" through a contained,

outdoor parking area, Lee stopped and took off all of his remaining clothes and began running

through the parking lot naked, in between cars, with Brooks continuing his pursuit. At some

point during this pursuit, Brooks radioed for other officers. A group of officers, including

officer-defendants Cregan, Mallery, and Smith, were at the "Tiger Mart" nearby and responded

to Brooks' radio request for assistance.

At 11:37:44 p.m., officer-defendant Mays, an officer certified by Metro to carry and

operate a taser device, entered the parking lot armed with his department-issued Taser X-26,

which is a product manufactured by defendant Taser.[2] Mays and Brooks were joined six seconds

later by officer-defendant Scott. At or a few seconds before 11:38:00 p.m., Mays, unable to

---

[2] The time statements come from the parties' review of a videotape of the incident, which
was recorded by a security camera across the street and has a time stamp in the bottom right-
hand corner. Various officer-defendants filed the videotape as a DVD (see Docket Nos. 295 and
304), which the court has reviewed. While the videotape provides some sense of the incident, its
poor quality diminishes it as conclusive evidence of what occurred between the officers and Lee,
particularly in the latter stages of the conflict.

4

immediately gain compliance from Lee using voice commands, deployed his first taser cartridge, meaning that, by activation of a trigger on the taser device, Mays released two probes from the taser in the direction of Lee. These probes are tethered by wires that conduct an electrical charge, so that, when the probes attach to the person, an electrical charge is passed down the wires, to the probes, and to the person through the probes, the shock of which is designed to incapacitate the person for a brief period of about five seconds. As long as the probes remain attached to the person, subsequent or sustained trigger pulls of the taser device will deliver the same or continued shock to the target. Mays' first activation of the device, as intended, incapacitated Lee, who fell to the ground and ended up flat, partially under a parked Mustang, near a parked Jeep.

After Lee went down, Brooks and Scott began scuffling with Lee, in an effort to get him handcuffed. While they were able to get one handcuff on Lee, Lee broke away from them and started evading the officers again, ignoring Brooks' verbal commands to stop. During this portion of the skirmish, Mays activated his taser device six more times, that is, pressed the trigger on the device six times in an effort to utilize the probes and wires that had already been launched in the first activation. The parties dispute whether these activations were effective, that is, whether they shocked Lee. While the taser download report from Mays' device indicates the number of times Mays depressed the trigger on the taser, there is no way to say definitively whether a particular trigger depression resulted in the target (Lee) actually receiving any electrical current. Also during this struggle, once Lee had evaded Brooks and Scott, Mays applied his taser in "drive" or "touch" stun mode, that is, he physically touched Lee with the taser device in an attempt to shock Lee into compliance, as would be done with an old-fashioned

"stun gun."

At 11:40:02, officer-defendant Wright entered the parking lot. Sergeant-defendant Pinkelton, alarmed by the department's inability to contact Brooks on the police radio, had departed for the Mercy Lounge and arrived at 11:40:12, followed closely thereafter by officer-defendants Scruggs and Fisher. Pinkelton warned the officers to beware of Lee's loose handcuff. Scruggs, who was also licensed by Metro to carry and operate a taser device, confronted Lee at the front of the Jeep, and Scruggs gave Lee several voice commands to stop and get down. Lee did not obey. Scruggs warned the other officers that he was going to deploy his taser, and then he did so. Lee again went down, and, at some point in the process, the wires from Scruggs' taser device got wrapped around the front bumper of the Jeep, which undermined the effectiveness of the taser. Scruggs left the scene at 11:41:29 to obtain another taser cartridge.

Meanwhile, Mays had left the disturbance to return to his car to obtain a second taser cartridge, and he re-entered the parking lot at 11:41:17. Twelve seconds later, Mays activated his taser device yet again. This activation did not cause Lee to fall down, and Lee detached the taser probes from his chest. In total, Mays activated his taser ten times, eight times during the deployment of the first cartridge and twice during the deployment of the second cartridge. While the parties dispute when it occurred, it is undisputed that one of these activations resulted in a self-inflicted shock of Mays. Totaled together, these activations lasted fifty seconds.

At 11:41:53, Scruggs returned to the parking lot with another taser cartridge and confronted Lee again. After not obtaining what he viewed as sufficient compliance from Lee using verbal commands, Scruggs deployed the taser cartridge, and, as he testified at his deposition, pressed the trigger at least three times, which caused Lee to fall and hit his head on

6

the step bumper of the Jeep.  Lee then rolled part of the way under the Jeep.  (Docket No. 343

Ex. 36 at 21.)   As Lee continued to struggle, Scruggs removed the expended cartridge from his

taser, and, as Mays did, used the taser as a stun gun on Lee's leg, firing it twice.  In total,

Scruggs activated his taser device nine times, for a total of forty-six seconds.  That is, during this

brief dispute, Scruggs and Mays activated their tasers a total of nineteen times, but it remains

unclear how many of these activations actually delivered electrical current to Lee.

     Also arriving on the scene during the dispute was officer-defendant Cregan, who was

nearby when he received Brooks' radio request for assistance.  By the time Cregan arrived, Lee

was naked and acting abnormally with a handcuff on one wrist.  After Lee hit his head on the

Jeep bumper, other officer-defendants on the scene, including Cregan, moved in, pulled Lee out

from under the Jeep, and handcuffed him, face down, with his arms behind his back.   Despite

being handcuffed, Lee continued to not remain still, so officer-defendant Fisher used a hobble

restraint to secure Lee's ankles, with the help of Scruggs.  During this period that Lee was

handcuffed, on his front, officer-defendant Smith asked him questions, including whether he was

on any drugs, to which Lee responded that he had taken LSD.  For a lengthy period of time

(estimated between four and ten minutes) after the final taser application, Cregan pinned Lee to

the ground by placing his right knee on Lee's lower back and his left knee on Lee's shoulder.

The parties dispute whether Lee was able to breathe effectively during this period of restraint.

Cregan contends that the restraint was necessary to keep Lee still.  After a period of minutes, Lee

stopped "bucking," at which point Cregan apparently believed that Lee had fallen asleep.[3]

---

       [3]In the course of the effort to contain Lee, other officer-defendants on the scene used
various forms of force.  In addition to firing his pepper spray, Brooks struck Lee on the shin with
his asp baton at one point when Lee was running past. Wright deployed pepper spray twice,

7

Lee was turned over and the officers (and paramedics who had been called at Sergeant Pinkelton's request) noted that Lee's lips had turned blue, indicating that he had stopped breathing. While the exact time that Lee's heart stopped and Lee's breathing ceased is subject to dispute, it is clear that, shortly after he was turned over, Lee was no longer breathing on his own, and his heart had stopped beating. The paramedics on the scene were able to restore Lee's heartbeat but not his breathing. Lee was loaded on a stretcher and rushed to Vanderbilt Medical Center.

Upon his arrival at Vanderbilt, Lee was determined to be severely acidotic, with a blood pH of less than 6.8, whereas 7.4 is normal. The physicians at Vanderbilt determined that Lee was suffering from metabolic acidosis and rhabdomyolysis, which is the breakdown of skeletal muscle tissue. The physicians at Vanderbilt never determined the source of these conditions. While at Vanderbilt, Lee's grave condition worsened, with the onset of renal failure. On September 23, 2005, the physicians at Vanderbilt declared Lee brain dead, and he was removed from life support on the afternoon of September 24, 2005, dying shortly thereafter.

Bruce Levy, M.D., performed the official autopsy on Lee's body on September 26, 2005. He subsequently issued his opinion that Lee's death was caused by "excited delirium" and that the manner of death could not be determined. According to Dr. Levy, fatal excited delirium involves the death of an individual suffering from mental illness or substance abuse who enters

_____

hitting Lee once, and also hit Lee once on the thigh with his baton. Fisher deployed pepper spray on one occasion and controlled Lee's legs while applying the hobble restraint. Scott merely "scuffl[ed]" with Lee in an effort to assist Brooks and the other officers attempting to handcuff Lee. At one point, officer-defendant Mallery struck Lee on the leg with his asp baton after Lee refused to comply with his command to get on the ground; finding this strike ineffective, Mallery re-holstered his baton and backed away.

8

into a violent struggle involving physical restraint and dies of a cardiorespiratory event at the conclusion of that struggle. According to Dr. Levy, metabolic acidosis would not be the cause of death, but rather would follow from the cause of death, excited delirium, and the subsequent cardiac event.

The plaintiffs dispute this determination of "excited delirium" as the cause of death. They point out that, despite having performed thousands of autopsies, Dr. Levy could not recall another instance in which he concluded that "excited delirium" was the cause of an individual's death. Rather, through their proffered experts, the plaintiffs claim that Lee died as a result of taser-induced muscle contractions, which released lactic acid into Lee's system and resulted in metabolic acidosis, a condition that became profound during Lee's struggle with police and was compounded by Cregan's oxygen-limiting restraint technique. In support, the plaintiffs also point to a proffered defense expert, Dr. Dawes, who testified at his deposition that "I think primary metabolic acidosis is the cause of death," something which, Dr. Dawes believes, was brought on by a number of factors, primarily Lee's physical exertion. (Docket No. 348 Ex. 3 at 96-97.) The plaintiffs also point to animal studies, including one in which swine (who have a similar skin density to humans) received repeated taser shocks and developed a build-up of lactic acid. At the time of his death, Lee had non-lethal levels of both LSD and marijuana in his system.

### B. Training and Warning Issues

One of the plaintiffs' core allegations in this case is that Metro failed to properly train its officers, a failure that, in part, caused the death of Lee. There is no dispute that all Metro

9

officers receive a substantial amount of training.[4]  Rather, the parties primarily dispute: (1) whether taser-certified officers Mays and Scruggs were appropriately apprised of updates on how to operate the taser; (2) whether the other officers at the Mercy Lounge understood how they were supposed to respond to a taser deployment; and (3) whether officers were trained in how to position a detained suspect to avoid a condition known as "positional asphyxia."

As to the first point, it is undisputed that, on or about June 28, 2005, Metro received from Taser a Taser training bulletin, known as Bulletin 12.0-04.  This bulletin emphasized that, for safety reasons, after deploying the taser probes, officers need to utilize the five-second "window of opportunity," that is, the time after a successful taser application in which the subject is incapacitated.  (Docket No. 279 Ex. N.)  Relatedly, the bulletin warned that "repeated ... exposures to the Taser electrical discharge may cause strong muscle contractions that may impair breathing and respiration ... users should avoid ... extensive multiple discharges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period."[5]  (*Id.*)

_____

[4]Metro provides a multi-week, 800-hour Basic Training Curriculum to all new recruits, which includes instruction on the use of force and medical care.  Further, Metro officers are required to attend forty hours of in-service training each year, which includes use-of-force updates.  Additionally, only officers who complete Metro's four-hour training certification class may carry a taser.  As noted above, both Mays and Scruggs completed this class and were certified by Metro to carry a taser.

[5]Another core allegation in this case is that Taser failed to provide sufficient warnings to Metro about the risks of its devices.  While every department will ultimately conduct taser training in its own way, Taser does provide a substantial amount of training materials to aid the departments.  That is, with every device sold, Taser provides a training CD/DVD and an operating manual, and Taser provides these training materials to taser instructors as well.  Taser also advises instructors that they should reference Taser's website before beginning any training, to ensure that the instructor knows about any updates provided by Taser.  As new materials and training bulletins come out, Taser forwards those materials to the relevant departmental contacts in its database, as it did here with the June 28, 2005 training bulletin discussed above.

Metro Sergeant Bob Allen attempted to send this bulletin to the taser-certified members of the Metro police department as an e-mail attachment on July 6, 2005, and requested a "read receipt" from each recipient, that is, a system-generated e-mail to Allen confirming that the recipient opened the e-mail (but not necessarily the attachment). (Docket No. 279 Ex. P.) While Metro has provided read receipts for both Scruggs and Mays, the versions of the July 6, 2005, e-mail provided in discovery indicate that Allen sent the e-mail without any explanation as to what the attachment said. Further, the e-mail and the read receipts fail to indicate that any document was actually attached to the July 6 e-mail, raising the possibility that the officers never actually received the training bulletin. (Docket No. 279 Exs. P and R.) Further, Scruggs testified that he had never read the bulletin because he was not able to open the attachment. (Docket No. 279 Ex. T.) Mays testified that he had no recollection of seeing the bulletin. (Docket No. 279 Ex. S.)

As to the second point (whether officers without tasers knew how to react to a taser deployment), Metro points to a 2005 lesson plan, instruction from which was given to Metro officers, including Brooks, Cregan, Fisher, Mallery, Smith, Wright, and Scott. (Docket No. 279 Ex. V.) This lesson plan instructed the teacher to advise that, once a taser had been deployed, the officers should "immediately move to the subject and try to get control of his/her hands." *Id.* Officer Brooks, who, according to records, attended this training session six weeks before the incident with Lee, testified at his deposition that he could recall no training on how to respond to a taser deployment. (Docket No. 343 Ex. 5 at 30.)

As to the third point (positional asphyxia), Metro produces its 2003 In-Service Training Academy Power Point Presentation titled "Officer Survival Update - Block I," which provides detailed instruction for officers on how to position a detained suspect and warns of the risk of

11

positional asphyxia, instructing officers to place the suspect in a sitting position as soon as the suspect is "under control."  (Docket No. 279 Ex. G.)  This presentation specifically warns against the assumption that a face-down suspect (particularly one who was previously exhibiting bizarre behavior such as public disrobing) has fallen asleep or has accepted his fate, and the presentation also warns that officers should "continually monitor" the suspect to ensure that he is breathing and is not in medical distress.  (*Id.*)

C.    **Procedural Issues**

On January 17, 2006, the plaintiffs filed this action in the Circuit Court for Davidson County, Tennessee, and the defendants removed the case to this court on February 10, 2006.  The plaintiffs filed their operative complaint in this case on September 28, 2006.  (Docket No. 53.)  Over the past two-plus years, numerous claims against various defendants have been dismissed or abandoned, extensive discovery has been taken, and there has been extensive summary judgment briefing.  As all the motions before the court have been sufficiently briefed, the court is in the position to address them.

**ANALYSIS**

As to the officer-defendants, the plaintiffs have asserted claims against each of them under 42 U.S.C. § 1983 for excessive force (Count VI) and violations of the Fourteenth Amendment (Count VIII), and the plaintiffs have also asserted a state-law battery claim against each of the officer-defendants (Count X).[6]  As to Metro, the plaintiffs have asserted a "policy and

_____

[6] For the reasons stated in Docket Nos. 168 and 185, this court has dismissed Count IX (state law negligence) as to Metro and various officer-defendants.  As the same rationale for dismissal of that count applies to all of the officer-defendants (immunity from suit on this cause of action under Tennessee law), the court will grant the pending motions to dismiss of Cregan, Mallery, and Smith and dismiss Count IX as to those defendants.  As the plaintiffs' TGTLA claim (Count XI), which was previously dismissed as to Metro, asserts the same negligence

practice" claim under 42 U.S.C. § 1983 (Count VII), and a Fourteenth Amendment claim (Count VIII) under 42 U.S.C. § 1983. Finally, as to Taser, the plaintiffs have asserted claims for negligence, breach of express and implied warranty, misrepresentation, and strict liability (Counts I-V). As discussed below, in the course of summary judgment briefing, the plaintiffs have abandoned some of these claims.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the

---

allegations as Count IX, this claim will be dismissed as to all officer-defendants as well. (See Docket No. 168; Docket No. 421 at 7.)

13

case with respect to which he has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.    The Officer-Defendants

As noted above, the plaintiffs have asserted two Section 1983 claims against the officer-defendants in this case, along with a state-law battery claim. To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). To establish a claim for state-law battery in Tennessee, the plaintiff must show that the defendant, without privilege and by "conscious and volitional act," committed an unlawful, harmful, or offensive touching against the complaining

party or its representative.  *See City of Mason v. Banks*, 581 S.W. 2d 621, 626 (Tenn. 1979).

As to the Section 1983 claims, in their Amended Complaint, the plaintiffs assert that the officer-defendants (who, it is undisputed, were acting under color of state law) violated Lee's rights by using excessive force.  (Docket No. 53.)  As the officer-defendants point out, the plaintiffs' arguments as to them are based solely on the allegation of excessive force, which is considered a Section 1983 claim based on Fourth Amendment protections only.  (See *e.g.* Docket No. 233 at 30, citing *Graham v. Connor*, 490 U.S. 386, 394-96 (1989)).  The plaintiffs advance no argument in support of a Fourteenth Amendment claim in their response, focusing solely on the allegation of excessive force.  (See Docket No. 400.)  Therefore, the plaintiffs' Section 1983 claim based on the Fourteenth Amendment will be dismissed, leaving, as to the officer-defendants, the plaintiffs' Section 1983 claim based on the Fourth Amendment (excessive force) and the plaintiffs' state-law battery claim.

As to the Section 1983 excessive force claim, the officer-defendants have asserted that, even if they violated Lee's constitutional rights, they are entitled to protection under the doctrine of qualified immunity.  (See Docket No. 233 at 34-38; Docket No. 242 at 4; Docket No. 250 at 4; Docket No. 256 at 4; Docket No. 273 at 9; Docket No. 310 at 12.)   In order to minimize the "general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service," the Supreme Court has recognized qualified immunity as an affirmative defense against an alleged violation of a constitutional right.  *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982); *Caudill v. Hollan*, 431 F.3d 900, 911 (6th Cir. 2005).

The Supreme Court has developed a two-part test to determine if the qualified immunity

15

defense is available in a given case.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).[7]  The first

step requires the court to consider, in the light most favorable to the party asserting the injury,

whether the facts alleged show that the official's actions violated a constitutional right.  *Saucier*,

533 U.S. at 201 (citing *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).  The qualified immunity

inquiry comes to an end if a constitutional right was not violated.  *Id.*  But, if the plaintiff has

sufficiently established a violation of a constitutional right, the second step in the qualified

immunity analysis is to determine whether the violated right was clearly established.  *Id.*  In

determining whether a right was clearly established, the court must undertake the inquiry "in

light of the specific context of the case, not as a broad general proposition."  *Id.*  Indeed, "the

relevant, dispositive inquiry in determining whether a right is clearly established is whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  *Id.*

As to the state-law battery claim, in Tennessee, an officer is privileged to use the amount

of force necessary to effect an arrest, without fear that he will be liable for common law battery.

(See *e.g.* Docket No. 233 at 39 citing *City of Mason*, 581 S.W. 2d at 626).  That is, in Tennessee,

an officer is not liable for battery unless the actions taken to effect the arrest, taking into account

the presumption that the officer acts in good faith, were "clearly excessive."  *Id.*

---

[7] In an opinion dated January 21, 2009, the Court clarified that the *Saucier* two-part test
is no longer considered "mandatory," freeing district courts from rigidly, and potentially
wastefully, applying the *Saucier* framework in cases that could be more efficiently resolved by a
modified application of that framework.  *See Pearson v. Callahan*, S. Ct. No. 07-751, Slip. Op.
at 10.  That said, the Court concluded that, in many cases, applying the *Saucier* framework
remains "appropriate" and "often beneficial."  *Id.*  Here, the application of that framework is
helpful, as shown below, in determining the right at issue and then if that right was clearly
established.  Therefore, while appreciating its newfound discretion, the court will apply the
*Saucier* framework here.

**A.      The Remaining Section 1983 Claim (Excessive Force)**

As noted above, the first inquiry here is whether the officer-defendants, acting under color of state law, violated the constitutional rights of Lee -- here, the Fourth Amendment right not to be subject to the excessive use of force by police officers acting under color of state law. Claims of excessive force are evaluated under the standard of "objective reasonableness," that is, viewing the facts and circumstances from the perspective of a reasonable police officer on the scene, was the degree of force used objectively unreasonable. *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). Plainly, an officer has the right to use some degree of "physical coercion" to effect an arrest. *Id.* In evaluating whether the physical coercion used crossed over to the point of being excessive, the court should consider, among other things, (1) the severity of the crime at issue; (2) whether the suspect poses a threat to the safety of the officers or others; and (3) whether the suspect is actively evading arrest. *Id.* Ultimately, the "objective reasonableness" test involves a pure "totality of the circumstances" analysis. *Id.* at 237. With this standard in mind, the court will examine the conduct at issue here, noting that, under Sixth Circuit precedent, the individual actions of each officer should be considered separately. *See Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004).

**I.      Brooks, Fisher, Mallery, Pinkelton, Scott, Smith, and Wright**

As indicated by the factual discussion above, several officer-defendants in this case plainly did not use excessive force and are, therefore, entitled to summary judgment on this claim. Indeed, there is no allegation that officer-defendants Scott and Smith used any force other than that used in some minor grappling with Lee in an effort to contain him. (Docket No. 404 at 6; Docket No. 376 at 4.) Sergeant-defendant Pinkelton also used no force during the struggle

17

(Docket No. 404 at 14), and there is no allegation that he "encouraged the specific incident of misconduct or in some other way directly participated in it" such that he could be liable under a theory of supervisory liability. *Jackson v. Shelby County Gov't.*, 07-6356, 2008 WL 4915434, *2 (6th Cir. Nov. 10, 2008) *citing Bellamy v. Bradley*, 729 F.2d. 416, 421 (6th Cir. 1984).

Further, as discussed above, officer-defendants Fisher, Mallery, Wright, and Brooks all used a relatively mild degree of force in their attempt to subdue Lee, that is, either a single strike of an asp baton on the leg (Mallery, Docket No. 373 at 6), a burst of chemical spray (Fisher, Docket No. 404 at 14), or some combination of the two (Brooks, Docket No. 399 at 5-8 and Wright, Docket No. 404 at 13-14). Plainly, these relatively tepid, isolated uses of force could hardly qualify as "excessive." The Sixth Circuit has concluded that the use of pepper spray and the asp baton are not *per se* unreasonable and that it is reasonable for an officer to use these devices in a moderate, non-gratuitous way, in an effort to control a non-compliant, loose subject. *See Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997) (pepper spray); *see Champion v. Outlook Nashville, Inc.*, 380 F. 3d 893, 902 (6th Cir. 2004) (asp baton). Here, the limited uses of the asp baton and of the pepper spray were purposeful, and not gratuitous or repeated. When the efforts proved ineffective, these officers did not apply the force at issue.

As the degree of force used by officer-defendants Brooks, Fisher, Mallery, Pinkelton, Scott, Smith, and Wright was not excessive as a matter of law, these officer-defendants are entitled to summary judgment on the plaintiff's Section 1983 claim, without the necessity of considering those officer-defendants' qualified immunity arguments.[8]

_____

[8]Suffice it to say, the court finds no merit in the plaintiffs' confused argument that these officer-defendants are somehow liable for failure to intervene. (Docket No. 400 at 24-29.) The Sixth Circuit precedent relied on by the plaintiffs involved a case with wholly different facts, in which the plaintiff was savagely beaten by police officers, some of whom the plaintiff could

18

### ii.   Cregan, Mays, and Scruggs

#### a.   Violation of a constitutional right

The conduct of these three officer-defendants, however, is significantly more troubling. First, as to officer-defendant Cregan, it is clear to the court that, drawing all reasonable inferences in the favor of the plaintiffs, a reasonable jury could conclude that Cregan violated Lee's constitutional rights.  The undisputed facts show that, *after Lee had been handcuffed and the hobble restraint was applied*, Cregan, in an effort to guarantee that Lee remained still, remained on top of Lee with his weight, which was substantial, resting on Lee's back.  (Docket No. 398 at 5-6.)  While it remains unclear how long Cregan remained in this position, it is undisputed that he was there for more than a few minutes, and, there is reason to believe that, by the time Cregan finally moved off of Lee and turned him over, Lee was no longer breathing.  *Id.* The Sixth Circuit has previously concluded that "creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force."  *Champion*, 380 F.3d at 903.  Even assuming for the moment that Lee did not die, in part, because of pressure put on him by Cregan, a reasonable jury could still conclude that Cregan's use of force, that is, putting Lee at risk of "positional asphyxia," was objectively unreasonable given the circumstances and, therefore, a violation of Lee's constitutional rights.  *Id.*

---

identify and some of whom he could not.  *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982).  Here, the conduct of the individual officers is clear and, largely, undisputed, and it would be unfair to impose liability on an officer who did not engage in excessive force simply because he responded to another officer's distress call.  Further, more recent Sixth Circuit precedent instructs that the court is to consider the force used by each officer individually and not view the officers' conduct in a collective sense.  *See Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004).

19

To the court, Cregan's justification in his deposition testimony – that he felt that he needed to remain on top of Lee because Lee was moving from "side to side" and "bucking" – has little merit. (Docket No. 343 Ex. 11 at 19-21.) The undisputed facts show that Cregan remained on top of Lee while Lee was in handcuffs and in a foot hobble restraint. Further, the decision to remain on top of Lee out of an unjustifiable fear for officer or suspect safety was clearly inconsistent with the directives of the Metro Police Department, which instructed that a suspect should be moved to a seated position as soon as practicable. (Docket No. 279 Ex. G.) Therefore, Cregan is not entitled to summary judgment on the grounds that he did not violate Lee's Fourth Amendment rights.

As to Mays and Scruggs, the officers who operated the tasers, the court makes the same finding. As the Sixth Circuit recently concluded, multiple taser applications over a period of "several seconds" can, particularly when coupled with other abuses, amount to excessive force. *See Landis v. Baker*, 07-2360, 2008 WL 4613547, *7 (6th Cir. Oct. 16, 2008). In *Landis*, the facts showed that the suspect was being held down in water while he was being tased and that he received drive stun applications while the police were grappling with him, as occurred here. *Id.* at *4. While the circumstances of many of the taser applications here remain unclear, it is clear that, unlike in *Landis*, at least some of those applications occurred while Lee was still evading police.

That said, the court does not read *Landis*' finding of excessive force to rely exclusively on the fact that the suspect was being restrained when the taser was applied. Rather, the court reads *Landis* to hold that, under appropriate circumstances, gratuitous, repeated applications of the taser over a short period of time can amount to excessive force. *Id.* In this court's view, a

20

reasonable jury could find those circumstances present here. Both Mays and Scruggs fired their taser devices multiple times over a short period, with Mays testifying that the eight taser applications from his first cartridge all occurred within the space of two minutes. (Docket No. 263.) While the timing of Scruggs' activations is less clear, at his deposition he testified that he applied the taser at least three times in very rapid succession when deploying his second cartridge. (Docket No. 343 Ex. 36 at 21.)

The circumstances giving rise to the encounter with police must also be considered. *Landis* instructs that, where the troubling use of force was committed against a suspect that was at most guilty of a "minor and non-violent crime," and the suspect was "surrounded," "unarmed," and "no longer a threat," the likelihood that the troubling use of force may be considered a constitutional violation is significantly heightened. 2008 WL 4613547, *7. The notion, advanced here by the defendants, that Lee needed to be violently subdued because he was a danger to himself is unpersuasive at best. Under the circumstances, the court can safely conclude that Mays and Scruggs are not entitled to summary judgment on the plaintiffs' Section 1983 claim based on their argument that they did not violate Lee's constitutional rights.[9] The court now turns to the qualified immunity issue.

### b. Qualified immunity

Even if, as here, the plaintiffs sufficiently establish the violation of a constitutional right

---

[9]Some officer-defendants claim that, because "a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury," they are not liable because, they claim, their actions did not cause Lee's death. (See Docket No. 233 at 4 citing *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994)). This argument is unavailing because, even setting aside the disputed point about cause of death, there is no question that Mays, Scruggs, and Cregan caused Lee some injury, whether or not that injury led to his death.

by a state actor, the plaintiffs must also establish that the right violated was "clearly established" at the time of the violation in order to avoid dismissal on the grounds of qualified immunity. *Griffith v. Coburn*, 473 F.3d 650, 658 (6th Cir. 2007). As noted above, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201. That is, to be "clearly established ... the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Landis*, 2008 WL 4613547, *8. While a party can turn to explicit case law of the Supreme Court and the relevant circuit courts to show that the rights violated were "clearly established," that is plainly not necessary. *See Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004); *Landis*, 2008 WL 4613547, *8.

As to Cregan, Mays, and Scruggs, the court finds qualified immunity protection to be inapplicable in this case. First, as to Cregan, as noted above, the Sixth Circuit, in 2004, prior to the incident involving Lee, held that "creating asphyxiating conditions by putting substantial or significant pressure, such as body weight, on the back of an incapacitated and bound suspect constitutes objectively unreasonable excessive force." *Champion*, 380 F.3d at 903. Therefore, an individual's constitutional right to be free from this brand of restraint was clearly established prior to the incident at issue here and, therefore, Cregan is not entitled to dismissal on the ground of qualified immunity. As to Mays and Scruggs, it is not necessary that the plaintiffs point to a case that holds that the repeated, quick succession, gratuitous use of a shocking, incapacitating device on a cornered, unarmed, non-violent, naked suspect who committed no serious crime is a violation of a clearly established constitutional right. As "it would be clear to a reasonable

22

officer that his conduct was unlawful in the situation he confronted," Mays and Scruggs are not entitled to dismissal on the basis of qualified immunity.  *See Brosseau*, 543 U.S. at 198-99.

## B.    Common Law Battery

As discussed above, Tennessee law permits police officers to use the force necessary to effect an arrest, and police officers are only subject to civil penalties for common law battery when, under the circumstances, they employ force that is "clearly excessive." *City of Mason*, 581 S.W. 2d at 626.  Plainly, whether the analysis concerns whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns whether an officer committed state-law battery by using force that was "clearly excessive," the same principles –  those discussed above – are applied.  *Id.*  The court, therefore, concludes that officer-defendants Brooks, Fisher, Mallery, Pinkelton, Scott, Smith, and Wright are entitled to summary judgment on this claim, while officer-defendants Cregan, Mays, and Scruggs, are not.  As no claims will remain outstanding against officer-defendants Brooks, Fisher, Mallery, Pinkelton, Scott, Smith, and Wright, this case will be dismissed as to them.

## C.    Plaintiffs' "Police Practices" Experts

Various officer-defendants, including Mays, have moved to exclude the testimony and expert reports of the plaintiffs' two proffered "police practice" experts, Ernest Burwell and Roger Clark.[10]  (See *e.g.* Docket Nos. 221-225.)  As a general matter, the plaintiffs have offered

_____

[10]  Officer-defendants Mays, Scott, Wright, Pinkelton, and Fisher filed joint motions to disqualify both Burwell and Clark (Docket Nos. 221 and 223 respectively), and officer-defendant Brooks joined the motion as to Burwell, without adding any substantive argument. (Docket No. 308.)  As should be clear from the foregoing discussion, it was unnecessary to consider the opinions of Burwell and Clark in analyzing the officer-defendants' motions for summary judgment.  Therefore, the court will address only whether Burwell and Clark pass the *Daubert* threshold and should be permitted to testify at trial.  *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

23

both Burwell and Clark on issues related to whether the police used excessive force in this case. (Docket Nos. 367-368.)

Federal Rule of Evidence 702 provides that, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. In its "gate-keeping" role, a trial court must evaluate the reliability of expert testimony, whether the testimony offered is "scientific" or not. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

While the court's general "gate-keeping" function exists whenever supposedly "expert" testimony is offered, when that expert testimony is outside of the scientific realm, the court's fundamental objective is to generally evaluate, based on whatever factors are important in the particular case, the relevancy and reliability of the testimony, and not necessarily explore the factors that might be relevant in the realm of "scientific" expert testimony, such as whether the expert's writings have been peer reviewed or whether the expert's methods are subject to empirical testing. *Id*. at 151. That is, the court is to ensure that the proffered testimony is reliable and relevant and that the expert, whatever his field, "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. When expert testimony is primarily based on the experience that the proffered expert has gained through personal endeavors, the expert "must explain how that experience leads to the

24

conclusion reached ... and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

The Sixth Circuit has explored the standards that the district courts should use in evaluating whether so-called "police practices" experts should be allowed to testify at trial. *See Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994); and, more recently, *Champion,* 380 F.3d at 907-08. In *Champion*, in discussing experts who opine on police practices and procedures, the Sixth Circuit clarified *Berry*, noting that, if the proffered expert had "specialized knowledge" and "specific expertise about police activities" with "experience on the subject of criminology or police actions" such that the proffered expert could opine on "discrete aspect[s] of police practices [such as] excessive force, based on particularized knowledge about the area," then the testimony would likely be permissible, particularly if it was supported by strong experiential or educational credentials. *Id.* In sum, the court stated that "the proper actions of individual officers in one discrete situation" is an appropriate field for expert testimony, so long as the expert has sufficient credentials and the testimony will assist the trier of fact. *Id.*

I.      **Ernert Burwell**

Burwell is a use-of-force expert, proffered by the plaintiffs specifically to opine on issues related to whether the taser was appropriately used in this incident. (Docket No. 221 Ex. 1.) According to his expert report, Burwell was a Los Angeles County Deputy Sheriff from 1977 to 2006, gaining a speciality in canine handling. (*Id.*) Burwell was also a taser instructor for "several years," having taught approximately forty-five deputies and six sergeants how to properly use a taser, and, through this work as an instructor, Burwell is familiar with analyzing taser download reports. (*Id.*) In his expert report, in addition to outlining his qualifications,

25

Burwell offered sixteen different opinions, including, among others, whether the taser should have been used against Lee, how Pinkelton should have acted, whether Metro properly trained its officers, and whether excessive force was used. (*Id.*)

In their motion to exclude Burwell entirely, the defendants primarily rely on conclusory statements and personal attacks, completely ignoring Burwell's experience as a taser instructor. (Docket No. 221 at 2-6.) More narrowly, the defendants also contend that Burwell should not be permitted to opine on how the Taser X-26 should have been used, because Burwell was only certified in the M-26. However, the defendants fail to state how that difference in certification would render Burwell's testimony unreliable. (*Id.* at 6-7.) The defendants then lodge a series of pre-emptive arguments based on certain statements in Burwell's expert report, arguing that Burwell should not be allowed to testify as to (1) the "internal workings" of the taser device at issue; (2) the medical consequences of being tased; (3) how a taser device operates properly; and (4) how a taser should be used in a "real world" situation with a "resisting suspect." (*Id.* at 7-9.) The remainder of the defendants' motion is a recounting of various opinions offered by Burwell in his expert report, followed by the defendants' explanation as to why those various opinions are unreliable, inaccurate, and should be "excluded or limited." (*Id.* at 9-23.)

Fortunately, in their response to the defendants' motion, the plaintiffs' have clarified the subject matter of Burwell's testimony, stating that Burwell will be offering testimony on: (1) whether the repeated shocks from Mays and Scruggs constituted excessive force; (2) whether Metro (including Sergeant Pinkelton) properly trained and supervised its officers as to the taser; and (3) related testimony on "taser training, the deployment criteria for tasers, the purpose of taser deployments, tactics and strategies to be utilized during taser deployments, the expected

26

effects from taser discharges and generally how the discharges incapacitate the subject, and the existence of, or lack thereof, warnings concerning taser use." (Docket No. 367 at 3, 8.) The plaintiffs clarify that Burwell is not being offered to testify on any medical issues or the physical effects of the taser on Lee. (*Id.* at 8.)

As indicated above, Burwell's confusing expert report and the defendants' attempt to pick apart seemingly every sentence of that report has taken this issue far afield of where it should be. The relevant issue is not the precise wording of Burwell's expert report, but whether Burwell is qualified to opine as an expert in this case, based on his experience. The court finds that, based on Burwell's substantial experience as a taser instructor and deputy sheriff, he is well qualified to offer his opinions on the issues of "taser training, the deployment criteria for tasers, the purpose of taser deployments, tactics and strategies to be utilized during taser deployments, the expected effects from taser discharges and generally how the discharges incapacitate the subject, and the existence of, or lack thereof, warnings concerning taser use," and the related issues of whether Metro's training of officers in taser use was appropriate and whether the repeated applications of the taser by Scruggs and Mays were unreasonable. (*Id.* at 3,8) That is, based on the study of the taser device that Burwell must have undertaken in order to teach dozens of high-level police department officials how to effectively operate a taser, Burwell is uniquely qualified to opine as an expert to a jury on how a taser is properly used and whether the taser was properly used here. The court finds that this testimony is obviously relevant, and, based on Burwell's experience, reliable, particularly given the defendants' right to conduct a

vigorous cross examination.[11]

## II.    Roger Clark

Clark is also a use-of-force expert proffered by the plaintiffs.  (Docket No. 223 Ex. 1.)

Clark worked for the Los Angeles County Sheriff's Department for twenty-seven years, holding

the ranks of deputy sheriff, sergeant, and lieutenant.  (*Id.*)  Clark retired in 1993.  (*Id.*)  While

Clark held a wide range of administrative and supervisory positions during his career, it is

particularly notable that (1) Clark served on the training staff of the Los Angeles County

Sheriff's Department's Patrol School, which taught officers proper apprehension methods and

(2) Clark sat on the Departmental Review Committee investigating allegations of unreasonable

use of force by police officers.  (*Id.*)  During his career, Clark also served as a lecturer on use-of-

force techniques to the department's Reserve Academy, and, in the final five years of his career,

Clark commanded a specialized unit investigating violent career criminals and heavy narcotics

traffickers.  Clark states that his experience with this unit, making arrests in precarious

circumstances, gave him an opportunity to further apply, and instruct other officers on, the

proper use-of-force techniques to use when effecting arrests and detainments.  (*Id.*)  Since his

retirement sixteen years ago, Clark has served as an expert witness on issues related to police

practices and administration.  (*Id.*)

In their motion to exclude Clark, the defendants primarily focus on the fact that Clark has

---

[11] In their reply in support of their motions to exclude both Burwell and Clark, the
defendants make a timing objection, arguing that the plaintiffs' response should be disregarded
because it was filed "over two weeks late."  (Docket Nos. 419 and 420 at 2.)  Given the
confusing timing issues created by the plaintiffs' need to re-file much of their briefing in this
case, the limited, if any, prejudice to the defendants, and the importance of the issues raised by
the plaintiffs in their responses, the court chooses to look past this issue.

not worked for a police force since 1993. (Docket No. 223 at 4-7.) Also, the defendants focus on what Clark is not – pointing out, among other things, that Clark is not an instructor in police defensive tactics, was never designated by his employer as a "specialized expert," and has no medical expertise. (*Id.*) The defendants also argue that Clark should not be permitted to testify about the taser, because he has only received training on the M-26 device and has only "test-fired" the X-26 device, meaning that he is unable to assist the trier of fact on issues related to how the taser works or the physical consequences of getting shocked by a taser on one or more occasions. (*Id.*) As with their Burwell motion, the remainder of the defendants' motion is a recounting of various opinions and statements offered by Clark in his expert report, followed by the defendants' explanation as to why those various statements and opinions are unreliable or inaccurate and should be "excluded or limited." (*Id.* at 8-26.)

As they did in the Burwell response, the plaintiffs once again helpfully clarify the scope of the proffered testimony by stating that Clark will be offering testimony on (1) whether the repeated shocks from Mays and Scruggs constituted excessive force; (2) whether Metro (including Pinkelton) properly trained and supervised its officers regarding the taser and (3) related testimony regarding the duty of the departments to make sure that officers understand the dangers of the tools that they are using. (Docket No. 368 at 3, 13.) The plaintiffs clarify that Clark is not being offered to testify on any medical issues or the physical effects of the taser on Lee. (*Id.* at 17.)

Again, the relevant issue is not precisely what Clark said in his expert report, or whether he has worded his opinions precisely to the defendants' satisfaction. It is notable that the defendants spend much more time picking at the semantics of Clark's expert report than they do

arguing that he cannot offer relevant and reliable testimony on the issues identified above. Plainly, Clark's nearly three decades of experience in the police department, including work as a high level supervisor, lecturer and instructor make him uniquely qualified to discuss whether the defendants used an appropriate level of force here, and whether Metro properly trained its officers in how to use the tools that they were given. While Clark has limited experience working with the taser, based on his experience, he is capable of understanding how a taser basically works and whether a certain type of application would be unreasonable. The court finds that this testimony is obviously relevant, and, based on Clark's experience, reliable, particularly given the defendants' right to conduct a vigorous cross examination. Whether his expertise is dated or his experience with tasers too limited go to the weight of his testimony, not its admissibility.

### D.     The Motion To Strike

As to the officer-defendants, the final issue is their motion to strike certain documents filed by the plaintiffs' in summary judgment briefing. The original motion to strike was filed jointly by Mays, Fisher, Pinkelton, Scott, and Wright (Docket No. 411), and joined, without any substantive argument, by Brooks (Docket Nos. 413 and 442), Metro (Docket No. 427), and Scruggs (Docket No. 438). At issue are the unsworn oral and written statements of fourteen witnesses to the incident, which the defendants argue should be stricken as, among other things, hearsay. (Docket No. 412 at 2-3.) The defendants argue that, with the exclusion of these statements, there is no genuine issue of material fact and that they are entitled to judgment as a

matter of law.[12] (*Id.*) While the statements, at least in large part, do appear to be hearsay, the issue is moot. As should be clear from the discussion above, the court reached its conclusions as to the propriety of summary judgment as to each officer-defendant without the need to consider the unsworn, hearsay statements of witnesses at the scene. Granting the motion and excluding this evidence would have no impact on the court's decision. And, as discussed below, the court will reach its conclusion as to the propriety of Metro's motion for summary judgment without the need to consider these materials either. Therefore, these motions will be denied as moot.[13]

III.    **Metro**

As of now, it appears to be agreed that only one of the plaintiffs' claims remains viable against Metro – that is, the plaintiffs' claim under Section 1983 for "municipal violations" resulting from Metro's failure to train its officers.[14] While Metro spends much of its brief arguing that its officers receive thorough basic training, that it has a "comprehensive process for reviewing uses of force," a disciplinary program, a general use-of-force protocol, and that its officers are trained to spot cases of "excited delirum," (see *e.g.* Docket No. 280 at 3-4), the pivotal issues for purposes of Metro's motion are: (1) whether Metro sufficiently apprised its taser-certified officers (including Mays and Scruggs) on important safety updates involving the

---

[12] Through their motion to strike, the defendants have also moved to strike the expert reports of Burwell and Clark, a request that has already been addressed above. See note 10.

[13] Likewise moot is the plaintiffs' motion for leave to file CDs in support of its response to the defendants' motions to strike. (Docket No. 447.) Therefore, this motion will also be denied as moot.

[14] Going into summary judgment briefing, the plaintiffs also had a Section 1983 claim based upon alleged violations of the Fourteenth Amendment. As Metro argues in its briefing, and the plaintiffs do not challenge in their response, the facts do not support this claim, and, therefore, this claim will be dismissed.

31

taser; (2) whether Metro sufficiently trained its non-taser-certified officers on how to respond to

a taser deployment; and (3) whether Metro sufficiently trained all of its officers on how to avoid

the onset of "positional asphyxia" in detained suspects.  Because of genuine issues of disputed

fact in at least two of these areas, Metro is not entitled to summary judgment as to Count VII of

the plaintiffs' Amended Complaint.

### A.       Fourth Amendment Liability Standard ("Deliberate Indifference")

It is well settled that a Section 1983 claim against a municipality cannot be based on a

*respondeat superior* theory of liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91

(1978).  That said, if it is shown that a municipality's failure to train its employees appropriately

has created a "policy or custom" that violates federally protected rights, then the municipality

can be held liable for Section 1983 violations.  *Berry*, 25 F.3d at 1345.  Articulating this basis of

liability in the oft-cited *City of Canton* decision, the Supreme Court stated:

> the inadequacy of police training may serve as the basis for Section 1983 liability
> only where the failure to train amounts to deliberate indifference to the rights of
> persons with whom the police come into contact.  This rule is most consistent
> with our admonition ... that a municipality can be liable under Section 1983 only
> where its policies are the 'moving force [behind] the constitutional violation.'
> Only where a municipality's failure to train its employees in a relevant respect
> evidences a 'deliberate indifference' to the rights of its inhabitants can such a
> shortcoming be properly thought of as a city 'policy or custom' that is actionable
> under Section 1983.
>
> *City of Canton v Harris*, 489 U.S. 378, 388-89 (1989) (internal citations omitted)

In *Ellis*, the Sixth Circuit articulated a three-part test, which states that, in order for a

plaintiff to succeed on a Section 1983 claim based on a failure-to-train theory, the plaintiff must

show that (1) the training was inadequate for the tasks performed; (2) the inadequacy was the

result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to

or actually caused the injury at issue. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).[15]

Plainly, many cases will be vigorously contested under factor two, that is, whether the municipality showed "deliberate indifference" or sufficient carelessness as to training inadequacies that arguably led to injuries. *Id.* In *Ellis*, the Sixth Circuit identified two instances in which a finding of deliberate indifference would be appropriate: (1) where the training lapse occurs despite "foreseeable consequences" that will flow from the lapse; and (2) where the training lapse occurs despite "repeated complaints" to the municipality about the issues that should have been dealt with in training. *Id.* at 700-01.[16]

As noted above, under the *Ellis* standard, the plaintiff must first show whether taser-certified officers (including Mays and Scruggs) received adequate training on how to operate their tasers, specifically instruction that it could be dangerous to apply multiple shocks to a suspect over a short period of time. Plainly, at least for purposes of Metro's motion, there are disputed issues of fact as to whether the training was adequate for the task performed. The

---

[15] Metro cherry-picks some out-of-context language from a Sixth Circuit case from almost twenty years ago to argue that, when evaluating a failure-to-train claim, the court is to look at the municipality's training program "in its entirety, regardless of the emphasis placed on discrete topics a plaintiff deems important to a given case." (Docket No. 280 at 7 citing *Walker v. Norris*, 917 F.2d 1449, 1456 (6th Cir. 1990)). Plainly, the "relevant respect" language of *Canton* and the language of *Ellis* instruct that the court is to examine particular deficiencies in the municipality's training program under the standard addressed above, and not simply "rubber stamp" a department's training program because it appears lengthy or it appears to cover many topics.

[16] It is worth noting that, in a seemingly disingenuous quotation from *Ellis*, Metro argues that "only where a 'city fails to act in response to repeated complaints of constitutional violations by its officers can the municipality be said to have acted with deliberate indifference." (Docket No. 280 at 30.) The persuasiveness of Metro's argument is not enhanced by its inability or its unwillingness to correctly argue the leading Sixth Circuit case on the issue at hand.

33

record reflects that, in November 2004, Mays and Scruggs audited a single, four-hour course on how to operate a taser, in which an instructor, Sergeant Allen, walked the class through Metro's taser X26 Student Guide. (Docket No. 279 Exs. J-K.) The Student Guide noted that tasers can cause "muscle contractions" but noted that no deaths from the taser had ever been reported. (Docket No. 279 Ex. K.) The Student Guide did emphasize the importance of using the "window of opportunity," and that officers could touch a tased suspect, but the Guide also instructed that two to three applications of the taser are generally needed for apprehension and, particularly troubling, instructed that the "taser user should anticipate holding the trigger down while the suspect is restrained," at least raising the inference that a taser user should be delivering electricity to the subject for the entire period that the suspect is being apprehended.[17] (*Id.*)

Therefore, it is safe to say that Metro's own Student Guide left taser-certified officers with a potentially confused understanding as to when and how the taser device should be activated, particularly if the first application did not have immediate effect. As noted in the factual discussion, on June 28, 2005, Taser sent a bulletin to, among others, Metro, specifically warning that "repeated ... exposures to the Taser electrical discharge may cause strong muscle contractions that may impair breathing and respiration ... users should avoid ... extensive multiple discharges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe over a protracted time period." (Docket No. 279 Ex. N.) As discussed above, Metro officials, without comment or the slightest

---

[17] At his deposition, Sergeant Allen testified that he would have been able to recognize that troubling language and would have been able to instruct students not to follow it, but he provides no specific recollection of having done so. (Docket No. 279 Ex. L at 20-22.)

34

explanation, attempted to forward this message to taser-certified officers, an attempt that, as discussed above, does not appear to have been successful.[18]  (Docket No. 279 Ex. R.)  There appears to have been no attempt by Metro to organize any training based on the information in the Bulletin, to engage taser-certified officers in any discussion about the information contained in the Bulletin, or even to assure that taser-certified officers had read the Bulletin, and not just the e-mail to which the Bulletin was (supposedly) attached.  Therefore, even assuming that the taser-certified officers here retained anything useful from the vague training that they received while auditing a course on a single November morning almost a year prior to the Lee incident, it is safe to say that the taser-certified officers such as Mays and Scruggs had little, if any, information about the fact that repeated applications of the taser device could have profound health consequences.

Therefore, as to this first issue of whether the officers were sufficiently trained on the risk of multiple applications of the taser device, the court finds that, for purposes of Metro's motion for summary judgment, a genuine issue of material fact exists as to whether they were.  Further, particularly in light of the June 28, 2005 Bulletin, a reasonable jury could conclude that it was foreseeable to Metro that a failure to train on this issue could lead to injuries or fatalities consistent with what happened to Lee and what was described in the Bulletin.  Finally, while the cause of Lee's death remains in substantial dispute, a reasonable jury could conclude that the

---

[18] Metro argues that this "warning" was "rescinded" by Bulletin 14.0-03, which Taser sent to police departments in April 2008, which, interestingly, revoked the warnings in Bulletin 12.0-04, on the basis of supposedly updated scientific information.  (Docket No. 280 at 16.)  Metro's argument, therefore, is that, because Taser, almost three years after the incident in question, has revoked this warning, Metro is somehow absolved from instructing its officers on how to effectively use the taser based on the information before Metro at the time.  Metro's argument is wholly detached from the logic of the *Ellis* case and is of no merit.

repeated applications of the taser device were at least "closely related" to Lee's death for purposes of the *Ellis* test. Therefore, Metro is not entitled to summary judgment as to Count VII.

Despite the fact that it is clear that Metro's motion for summary judgment should be denied, a brief discussion of the other two pivotal issues mentioned above is appropriate. First, Metro's argument that its non-taser-certified officers were sufficiently trained to respond to a taser deployment by a fellow officer appears problematic. Again, Metro relies mostly on the fact that, in 2005, each of the seven non-taser-certified officer-defendants in this case attended a training session, the lesson plan for which advised that the instructor should say that, once a taser had been deployed, the officers should "immediately move to the subject and try to get control of his/her hands. ... The only way for you to get shocked is to touch the wires or the probes. If you are shocked you can jerk away from it, it will not hold on to you." (Docket No. 279 Ex. V.) To the court, this instruction on the risk of shock would be somewhat unclear, particularly to a police officer with limited familiarity with the taser device. Further, even assuming the language here was crystal clear, there is nothing to suggest that non-taser-certified officers received any instruction (in Metro's general use-of-force order or anywhere else) on how to take advantage of the "window of opportunity," which strikes the court as the most vital aspect of taser deployment response. (See also Docket No. 279 Ex. C. at 7.)

Not only does the training on this issue seem potentially inadequate, but Metro's insistence on only providing substantive taser education (such as it was) to taser-certified officers and not to members of the police force who would be responsible for responding to taser deployments strikes the court as potentially demonstrative of a deliberate indifference to the foreseeable consequences, such as the events that occurred in this case. As to causation,

36

certainly, given the testimony that Lee went down, seemingly incapacitated, after the first taser

deployment from Mays, it appears that, if members of the "arrest team" had been sufficiently

instructed to get close to the suspect, swoop in and immediately detain the suspect during the

"window of opportunity," many of the subsequent taser applications and the subsequent struggle

would not have occurred. Rather, the record reflects that Metro armed some of its officers with

tasers and allowed its other officers to respond to taser deployments without any helpful

guidance. For the reasons discussed above, Metro's motion for summary judgment will be

denied.[19]

## IV.  Taser

At this stage in the litigation, only two of the plaintiffs' claims against Taser appear

viable, that is, the plaintiffs' negligence claim (Count I) and the plaintiffs' strict-products-

liability claim (Count V).[20] For the reasons discussed below, the court finds that Taser is entitled

---

[19] It is clear that Metro's motion for summary judgment will be denied regardless of
Metro's training on the third pivotal issue of whether Metro sufficiently trained its officers on
the issue of preventing "positional asphyxia." As mentioned in the factual discussion, Metro
primarily relies on a 2003 training booklet, which, with remarkable application to this case,
instructs officers on how to position a detained suspect and warns of the risk of positional
asphyxia, instructing officers to move a suspect to a sitting position as soon as the suspect is
"under control." (Docket No. 279 Ex. G.) The training booklet specifically warns officers not to
make the assumption that a face-down suspect (particularly one who was previously exhibiting
bizarre behavior such as public disrobing) has fallen asleep or has accepted his fate, and the
booklet also instructs officers to "continually monitor" the suspect to ensure that he is breathing
and not in medical distress. (*Id.*) While the court cannot locate any information from Metro
reflecting who received this training or in what form, this instruction certainly aids Metro's
argument that, at least at this point in time, it was not deliberately indifferent to the risks of
positional asphyxia.

[20] Going into summary judgment briefing, the plaintiffs also had claims based on
misrepresentation and warranty, but, as Taser argues in its briefing and the plaintiffs do not
challenge in their response, the facts do not support these claims, and, therefore, these claims
will be dismissed.

to summary judgment on these remaining claims and that Taser should be dismissed from this case.

The Tennessee Products Liability Act (TPLA) governs product-liability actions in Tennessee. See T.C.A. § 29-28-102(6). Whatever the precise theory of liability (negligence, warranty, strict liability, etc.), under Tennessee law, to establish a products-liability claim, the plaintiff must show that (1) the product was defective and/or unreasonably dangerous; (2) the defect existed at the time the product left the manufacturer's control; and (3) the plaintiff's injury was proximately caused by the defective product. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Plainly, if the product is not defective or unreasonably dangerous, the plaintiff's claim fails and it is unnecessary to address causation. That is the situation here.[21]

A product is defective when it is in a condition "that renders it unsafe for normal or anticipated handling and consumption." T.C.A. § 29-28-102(2). On the other hand, there are two ways to evaluate whether is a product is "unreasonably dangerous." Under the "consumer expectation" model, a product is unreasonably dangerous when "a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with ordinary knowledge common to the community as to its characteristics." T.C.A. § 29-28-102(8). And under the "prudent manufacturer model," a product is "unreasonably dangerous" when "the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition." *Id.*

_____

[21] The fact that Taser (and the plaintiffs) have focused extensively on causation is not lost on the court. That said, the appropriate way to analyze the claims here is to first explore whether there is a defect in the product or whether the product is unreasonably dangerous.

### A.    Product Defect

In its summary judgment brief, Taser effectively argues that the plaintiffs can point to no design or manufacturing defect in the Taser device.  (Docket No. 290 at 22-23.)  That said, in addition to arguing that a product suffers from a defect in design or manufacture, the plaintiff can also assert that the product suffers from a warnings defect.  To establish products liability based on a failure-to-warn theory, the plaintiff must show that: (1) the warnings at issue were defective; (2) the defective warning made the product unreasonably dangerous; and (3) the inadequate labeling proximately caused the claimed injury.  *Barnes v. Kerr Corp.*, 418 F.3d 583, 590 (6th Cir. 2005).  Generally, courts considering the adequacy of product warnings consider: (1) whether the warning adequately indicates the scope of the danger; (2) whether it communicates the seriousness of the harm that could result from misuse; (3) whether the physical aspects of the warning alert a reasonably prudent person to the danger; and (4) the means used to convey the warning.  *Id.*

Taser's argument and the record show that the plaintiffs cannot demonstrate a "warnings" defect either.  (*Id.* at 27.)  Indeed, via the June 28, 2005 Bulletin, Taser warned Metro, among others, about the exact problem at issue in this case – that is, that repeated applications of the Taser device could cause health problems, including breathing difficulties and over-exertion.  (Docket No. 279 Ex. N.)  By way of reminder, the June 28, 2005 Bulletin specifically warned police departments that  "repeated ... exposures to the Taser electrical discharge may cause strong muscle contractions that may impair breathing and respiration ... users should avoid ... extensive multiple discharges whenever practicable in order to minimize the potential for over-exertion of the subject or potential impairment of full ability to breathe

over a protracted time period." (*Id*.)

A review of the *Barnes* factors mentioned above shows the adequacy of the warning contained in the Bulletin. First, the warning "adequately indicates the scope of the danger," identifying that repeated applications of the Taser device can lead to breathing problems and the risk of over-exertion. (Docket No. 279 Ex. N.) Raising the concern that repeated applications of the device could cause specific health problems, such as "metabolic acidosis," would not have added anything useful to the warning, given that the intended audience was law enforcement officials, not physicians. Second, relatedly, the warning communicates "the seriousness of the harm that could result from misuse," identifying both the cause (strong muscle contractions) and the effect (breathing difficulties). *Id*. Third, the "physical aspects of the warning alert a reasonably prudent person to the danger," as the warning is presented near the top of a bullet-point list of instructions for officers, and Taser made no attempt to "bury" the warning. *Id*. Finally, "the means used to convey the warning" were appropriate; the warning was not merely shoved in a box along with the instruction manual and the Taser, but was set off in a Bulletin that one could perhaps describe as "urgent." In short, contrary to any notion that the warning was defective, the warning clearly identified the risk stemming from one particular use of the product and clearly and appropriately instructed its audience how to avoid that risk. *Barnes*, 418 F.3d at 590.

The plaintiffs contend that Taser somehow "rescinded" this warning because, in August 2005, two senior officials from Taser sent a letter to Mike Hager of the Nashville Police Department regarding the subject of repeated activations of the Taser device. (Docket No. 347 Ex. 25.) But the purpose of this letter was plainly not to rescind the previous warning, but to

40

emphasize that the June 28, 2005 Bulletin was a reminder to officers to "only use the necessary amount of force" and that "exposure to the Taser system is a stressful, physical exertion and that prolonged exposures should be avoided when practical" and that the Taser device is only to be used in "carefully designed and controlled doses." (*Id.*) While the court recognizes that some of the language in the letter is glib ("don't sit in a sauna for two hours without water, and don't deploy a Taser device for 10 minutes continuously without a darn good reason"), the court disagrees with the plaintiffs that "the obvious intent of the letter is to tell police officers that they should not pay any attention to the warnings issued by Taser only several weeks earlier." (Docket No. 403 at 20.) It is important to remember that this document is a letter to an individual sent by two individuals on behalf of Taser, not an official training bulletin designed to be used in the training of officers throughout the country. Based on the circumstances, the court does not see this letter as bearing on whether the Taser device had a warning defect.

Further, the plaintiffs make no attempt to argue that any failure to warn made the product unreasonably dangerous and that the inadequate warning proximately caused the claimed injury. *Barnes*, 418 F.3d at 590. Indeed, to effectively advance their theory here, the plaintiffs would have to show that the supposed "recission" of the Bulletin was somehow tied to the injuries Lee sustained, a showing that the plaintiffs have not even attempted to make.

## I.      The plaintiffs's motion to compel and re-open discovery - a brief aside

After summary judgment briefing concluded, the plaintiffs developed a new strategy for arguing that the Taser device is defective. In their Rule 56(f) Motion to Compel and Re-open Discovery (Docket No. 414) the plaintiffs point to a non-peer reviewed study from several Canadian researchers, released in December 2008, which, among other things, tested six Taser

41

devices manufactured prior to 2005 (like the Taser devices used on Lee) and found that four of those devices emit more electricity than Taser had designed. (Docket No. 415 at 1.) While the plaintiffs' brief in support of their motion is filled with exclamation points, fiery rhetoric, and other superficial attempts to persuade the court to "stop everything" and order more discovery on this issue, the court is not persuaded.

Fed. R. Civ. P. 56(f) provides that a court may issue "any just order" when the party opposing a motion for summary judgment shows, "by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). Here, for several reasons, the plaintiffs' motion is misguided, and, therefore, the court will deny the plaintiffs' motion.

First, it is undisputed by the proffered experts from both sides that the most apparent risk of receiving more electricity from the Taser device would be the risk of ventricular fibrillation. (Docket No. 415 at 21; Docket No. 452 Ex. A at 2.) But, in their deposition testimony, the plaintiffs' own proffered causation experts, in complete alignment with the testimony of the defense experts and Dr. Levy, opined that, because Lee was conscious for several minutes following the final Taser device application, Lee could not have suffered ventricular fibrillation, because ventricular fibrillation induced by the Taser device would have occurred within "seconds" of the application of the device. (Docket No. 346 Ex. 15 at 97-99; Docket No. 346 Ex. 4 at 77-79.)

The plaintiffs' experts also argue that, in addition to ventricular fibrillation, a greater electrical input into Lee's body would have strengthened Lee's muscle contractions, thereby exacerbating Lee's metabolic acidosis. (Docket No. 417 at 2.) Taser correctly responds that the

42

electrical output discussed in the Canadian study is based on the first electrical pulse from the Taser device, a pulse that only discharges the Taser device cartridge from the Taser device, and, therefore, does not enter the human body. (Docket No. 452 Ex. 2 at 12-13.) In their reply in support of their motion, the plaintiffs twist Taser's words, stating: "assuming that they are correct *and the first pulse occurs while the probes are in the air*, this only happens on the first trigger pull. It is undisputed that Patrick Lee was tased at least six times with the first cartridge after the probes were imbedded in his body! The probes were only in the air one time. With each subsequent application, this extra surge of electricity would have entered Lee's body." (Docket No. 454 Ex. 1 at 3.) (emphasis added). This statement is simply an unfounded extrapolation from the Canadian study, the relevant findings from which were based on the initial trigger pull, not subsequent trigger pulls.

Further, even without the "first pulse" issue, re-opening discovery on the basis of this study would be unwise. The relevant aspects of this study have not been peer-reviewed, and, for our purposes, the study involves a sample size of only six tasers. Heightening the concerns about the integrity of the study is the fact that the study makes some fairly outlandish claims, seemingly inconsistent with common sense, including that the risk of ventricular fibrillation from a pre-2005 Taser device could be as high as fifty percent. (Docket No. 415 at 8.) Further, as Taser points out, two of the three signatories to the study have been involved in research on behalf of one of Taser's chief competitor, Aegis.[22] (Docket No. 457 at 3.) It is worth noting

_____

[22] In its response to the plaintiffs' motion, Taser raises numerous other concerns regarding the reliability of the study, including that the "wrong electrical standards" were used, the study used the "wrong resistance load," and that the study conflicts with "peer-reviewed and published data." (Docket No. 457 at 3.) In their reply, the plaintiffs fail to challenge these assertions, arguing instead that the findings of the study raise the possibility that Taser has not

43

that, in their reply in support of their motion, the plaintiffs state "the study is not being offered for the truth of the matter asserted or even for its reliability. It is offered to show that Taser has not been honest ...". (Docket No. 45 8 at 3.) Not surprisingly, both sides vigorously argue that the other has committed discovery abuses and other malfeasance, but the plaintiffs' allegations to that effect are not sufficient to persuade the court to re-open discovery at this late date. Considering the circumstances of this case and this study, the court is not persuaded that the substantial costs of further discovery on this issue are outweighed by the benefits that might come from it. Therefore, the plaintiffs' motion will be denied.

**B.       Unreasonably Dangerous**

As noted above, a plaintiff can advance his products-liability claim by arguing that the product is defective or that the product is unreasonably dangerous. *Sigler*, 532 F.3d at 483. As discussed in detail above, the plaintiffs have failed to show that the Taser device was defective, and they have likewise failed to show that the product was unreasonably dangerous.

In their summary judgment response, the plaintiffs spend twenty-one of twenty-four pages discussing Taser's supposedly deceptive litigation tactics, rehashing the facts of this case, and challenging Dr. Levy's diagnosis of excited delirium as the cause of death. (Docket No. 403 1-21.) Finally, with just a few pages left, the plaintiffs turn to their allegation that the Taser X26 device is unreasonably dangerous. While the argument is never fully explained, the plaintiffs

---

been honest about potential, additional flaws with the Taser device, flaws, which as discussed above, seem of reduced consequence given the facts of this case. (Docket No. 458 at 3.) In sum, after almost three years of litigation and two years of voluminous discovery that has failed to demonstrate Taser's liability, the plaintiffs ask the court to put this case on hold so they can simply scour the landscape some more.

appear to be arguing that the unreasonable dangerousness of the Taser device arises from the fact that there is "a genuine issue of material fact regarding whether Taser X26 devices cause death," and that the officer-defendants in this case did not understand that the Taser device could cause death. (*Id.* at 23-24.)

But it is a matter of common sense and Tennessee law that simply because a product "cause[s] death" in certain circumstances does not make the product unreasonably dangerous. T.C.A.§ 29-28-102(8). Indeed, many, if not most, consumer products could cause death if sufficiently misused. Rather, the issue is whether the dangerousness is beyond what the reasonable consumer would expect or a reasonably prudent manufacturer would invite. *Id.* Here, the facts show that Metro was well apprised of the risks of the Taser device, and Metro, not Taser, had the responsibility to explain those risks to its officers. *See Morgan v. Brush Wellman, Inc.*, 165 F.Supp. 2d 704, 718 (E.D. Tenn. 2001) (under Tennessee law, "a supplier may reasonably rely on a sophisticated purchaser to warn users about the dangers of its products.") For the reasons discussed above, Taser is entitled to summary judgment. The plaintiffs have failed to raise a fact issue as to whether the Taser device is unreasonably dangerous or whether the Taser device has a defect. [23]

_____

[23] The court recognizes Taser's acknowledgment that "the general rule in Tennessee is that the issue of whether a product is defective or unreasonably dangerous is one for the jury." *Jackson v. Gen. Motors Corp.*, 60 S.W. 3d 800, 805 (6th Cir. 2001). That language, however, is prefaced by the Sixth Circuit stating that, before a jury trial is appropriate, the plaintiff must raise a question of fact as to whether the product is unreasonably dangerous based upon the consumer expectation test. *Id.* As discussed above, by merely stating that the Taser device "cause[s] death" the plaintiffs have failed to do that and, therefore, the finding, as a matter of law, that the Taser device is not defective or unreasonably dangerous is appropriate.

45

### iii.    Final points

A few final points regarding other pending motions are in order.  First, as noted earlier, Taser has moved to strike a substantial number of documents that the plaintiffs filed during summary judgment briefing.  (Docket No. 436.)  In addition to the materials that other defendants moved to strike, Taser has moved to strike various affidavits, causation expert reports and medical records, among other things.  (*Id.*)  Many of these materials related to the alleged causes of Lee's injuries.  As the court has concluded that Taser is entitled to summary judgment, Taser's motion to strike these materials is moot, and will be denied as such.

Finally, Taser has moved, *in limine*, to exclude the plaintiffs' four causation experts and the plaintiffs' failure to warn expert.  (See Docket Nos. 275 and 289.)  As the court will grant Taser's motion for summary judgment, this motion will be denied as moot.  The court is unable to determine from the record that any remaining defendants joined Taser in these motions to exclude.  To the extent that the remaining defendants object to these experts, their objections would most effectively be raised in their own motions, directed by any concerns that they may have about the experts, given the status of this case after the court's rulings herein.

### <u>CONCLUSION</u>

For the reasons discussed above: (1) the motions to dismiss of officer-defendants Cregan, Mallery, and Smith will be granted; (2) the summary judgment motions of seven individual officer-defendants (Fisher, Pinkelton, Scott, Wright, Brooks, Mallery, and Smith) will be granted and the summary judgment motions of the other three officer-defendants (Mays, Scruggs, and Cregan) will be granted in part and denied in part; (3) the officer-defendants' and Metro's motion to strike will be denied as moot, along with the plaintiffs' motion to manually file CDs;

46

(4) the motions to exclude police practices experts Burwell and Clark will be denied; (5) Metro's motion for summary judgment will be granted in part and denied in part; and, finally, (6) Taser's motion for summary judgment will be granted, its remaining motions denied as moot, and the plaintiffs' motion to re-open discovery and to compel denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

47