# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BUD LEE and CINDY LUNDMAN, as next friend and as natural parents of PATRICK LEE, deceased, | ) ) ) | |
| Plaintiffs, | ) ) | Civil No. 3:06-0108 |
| v. | ) ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, *et al*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Pending before the court are a Motion for New Trial filed by the plaintiffs, Bud Lee and

Cindy Lundman (Docket No. 600), the plaintiffs' two Motions to Review Costs (Docket Nos.

619 and 621), and defendant Metropolitan Government of Nashville and Davidson County's

("Metro's") Motion for Leave to Interview Jurors (Docket No. 598), which was joined by the

plaintiffs.  (See Docket No. 599.)  For the reasons discussed herein, the plaintiffs' Motion for

New Trial will be denied, the plaintiffs' Motions to Review Costs will be granted, and the joint

Motion for Leave to Interview Jurors will be denied.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A broad and thorough overview of the facts of this case was provided in the court's

lengthy Memorandum that ruled, among other things, on the summary judgment motions in this

case.  (Docket No. 462.)  In light of this, and the potential breadth of a complete factual

discussion, a brief overview of the largely undisputed facts is provided, and more specific

analysis is provided in regard to the plaintiffs' specific arguments in conjunction with their new

1

trial motion.[1]

This case involves the death of Patrick Lee, who was twenty-one years old when he was involved in an altercation with officers from the Metro Nashville Police Department outside of the Mercy Lounge nightclub in Nashville, Tennessee, on September 22, 2005. The incident began when Lee, after being told by bouncers to leave the Mercy Lounge, would not leave the parking lot, and the police were called. Officer Brooks, the first officer to respond, thought that Lee was acting aggressively toward him in the course of their brief and confused conversation, and, therefore, Brooks pepper-sprayed Lee. This action sharply escalated the incident, as Lee, who was apparently under the influence of LSD, began removing his clothes and ended up running around the parking lot naked. In response to police radio traffic, other officers began to arrive at the parking lot, including officer-defendants Mays and Scruggs, who were licensed to carry tasers by Metro.

In an effort to control Lee and to get him into custody, various officers employed various techniques, including individual baton strikes, grabbing, and pepper spray. By and large, these efforts were not effective because Lee, who was on drugs, sweaty and confused, was slippery and not easy to control or calm down. The most notable use of force, however, was the taser. During the course of the roughly ten-minute incident in which the officers pursued Lee in the parking lot, Mays and Scruggs activated their taser devices a total of nineteen times, although it was not even clear from the proof at trial how many of those taser activations were "effective," that is, how many activations caused Lee to be incapacitated or to even feel an effect. Following

_____

[1] The facts, as discussed herein, are largely drawn from the court's memory and notes of the trial, which are confirmed by the facts as discussed in the parties' post-trial briefing.

2

one of Scruggs' final taser activations, Lee was sufficiently incapacitated that other officers were able to move in and handcuff him. At this point, Lee was on his stomach, and officer-defendant Cregan, apparently in an effort to control Lee and to prevent him from getting back up, applied pressure to Lee to keep him down on the ground.

While the officers testified that Lee was conversational and breathing, if not completely lucid, during the several minutes that Cregan was applying pressure to him, at some point, Lee stopped communicating and, when the officers turned him over, Lee's lips were turning blue. Lee was taken to Vanderbilt University Medical Center by EMTs who were called to the scene; Lee never regained consciousness and died two days later.

At the summary judgment phase of the case, this court dismissed many of the plaintiffs' claims and various defendants for a variety of reasons. Notably, the court dismissed Taser International ("Taser") as a defendant, and the court dismissed seven of the ten officer-defendants, concluding, among other things, that, based on the undisputed facts, those seven officers (Smith, Scott, Wright, Mallery, Pinkelton, Brooks, and Fisher) did not use excessive force in violation of Lee's Fourth Amendment rights as a matter of law. (See Docket No. 462.)

The case proceeded to trial on the basis of a Fourth Amendment "excessive force" claim and a state-law battery claim against officer-defendants Mays, Scruggs, and Cregan, and a Fourth Amendment "failure to train" claim against Metro. (Docket No. 463.) After substantial pre-trial motion practice, a three-week trial was conducted, during which the plaintiffs abandoned their state-law battery claim. The jury determined that neither Mays, Scruggs or Cregan used excessive force on the night of the incident and returned a verdict in favor of those defendants. (Docket No. 589.) Because the jury was instructed not to consider the "failure to

3

train" claim against Metro unless they found an underlying constitutional violation by one of the three remaining officer-defendants, the jury's verdict in favor of Mays, Scruggs, and Cregan operated as a judgment in favor of Metro. (*See id.*)

## ANALYSIS

Following an adverse verdict in the three-week jury trial in this case, the plaintiffs have filed a Motion for New Trial, asserting that the verdict was against the weight of the evidence and that the court made a series of legal errors during the proceedings such that a new trial is warranted. (Docket No. 601.) The plaintiffs have also asked the court to review the bills of costs submitted by Metro and Taser, arguing that, while costs are ordinarily taxed against the losing party, it would be unfair and inappropriate to tax costs against the plaintiffs here because it would have a "chilling" effect on future litigants and because this was a close case prosecuted in good faith. (Docket Nos. 619 and 621.) Metro has also filed a Motion for Leave to Interview Jurors, which the plaintiffs have joined. (Docket Nos. 598 and 599.)

## I.     Motion For New Trial

### A.     Standard of Review

While a new trial can be ordered for a wide variety of reasons, generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993,

4

1002 (6th Cir. 1991).

Here, based on the plaintiffs' briefing, the relevant considerations are: (1) whether the court made a legal error in "instructing the jury that plaintiffs must prove that at least one of the three police officers used excessive force before they could find against [Metro] on the failure to train allegations" (Docket No. 601 at 7); (2) whether the verdict was against the weight of the evidence; (3) whether the court made a legal error in dismissing the other officer-defendants at the summary judgment stage; and (4) whether the admission of evidence and/or argument as to five specific matters rendered the proceedings unfair to the plaintiffs.

## B.    Metro and the Liability of the Individual Officers

The plaintiffs contend that it was error for the court to instruct the jury that, before it could consider Metro's failure-to-train liability, the jury had to find that "one or more of the defendant police officers deprived Mr. Lee of a constitutional right by use of excessive force."[2] (Docket No. 601 at 8; Docket No. 590 at 20-21.)  When a judge gives incorrect jury instructions, to which the movant has properly objected, a new trial may be granted if the improper instruction substantially affected the deliberation process.  That is, "a party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as

---

[2]Defendants Scruggs and Cregan argue that the plaintiffs failed to object to this instruction and, therefore, the plaintiffs waived this argument.  (*See e.g.* Docket No. 605 at 2.) Contrary to the defendants' arguments, the court remembers that the plaintiffs raised their objection to this instruction during the trial and during discussions of the jury instructions by arguing that an underlying constitutional violation by these specific officers need not be demonstrated before municipal liability could be considered by the jury.  The court was aware of the plaintiffs' dissatisfaction with the instruction and the basis for that dissatisfaction.  No more is required under Sixth Circuit law.  *See Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 427 (6th Cir. 1995).

5

a whole, are misleading or give an inadequate understanding of the law." *Arban v. West Pub. Corp.*, 345 F.3d 390, 404 (6th Cir.2003).

The plaintiffs acknowledge that, in *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), the Supreme Court held that its case law does not "authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." The Court went on to state that, "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id.* (emphasis in original).

In the plaintiffs' initial brief, in spite of *Heller*, they raise the same arguments that they raised, and the court rightfully rejected, during the conferences on this issue that occurred during the trial. That is, they point to cases that are not controlling and are not on point to argue that, somehow, a deviation from *Heller* is appropriate here. (*See* Docket No. 601 at 9-10.) Indeed, there have been a few, widely criticized cases that have either found that (1) a plaintiff may maintain a substantive due process claim against a municipality even in the absence of a constitutional violation by the officer (*See Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3rd Cir. 1994)); or, (2) in dicta, citing no case law and simply ignoring *Heller*, that a city could be liable on a failure-to-train claim, despite the lack of an underlying constitutional violation. *Hopkins v. Andaya*, 958 F.2d 881, 888 (9th Cir. 1992). Also, as Metro correctly points out in its response, "there are instances where an individual officer does not have to be held liable for municipal liability to attach," such as where an underlying constitutional violation has been found but the officer is entitled to qualified immunity. (Docket No. 603 at 2 citing *Doe v.*

6

*Sullivan County, Tennessee*, 956 F.2d 545, 554 (6th Cir. 1992)).

A review of the controlling Sixth Circuit case law shows that this Circuit follows the plain language of *Heller* and, therefore, this court had no choice but to instruct the jury that, unless the jury found a constitutional violation by officer Mays, Scruggs and/or Cregan, they could not consider Metro's failure-to-train liability. *See Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (in a Fourth Amendment case, "because the jury found no constitutional violation by the individual defendants, the county could not have been found liable under *Monell* for an allegedly unconstitutional custom or policy."); *see also Whitlow v. City of Louisville*, 39 Fed. Appx. 297, 302 (6th Cir. 2002) (in a Fourth Amendment excessive force case, "if Whitlow suffered no constitutional violation, then Plaintiff's claims against Louisville and Hamilton alleging that their lack of training and failure to supervise the individual officers resulted in Decedent's death, must fail. In other words, Plaintiff's claims against the city are dependent upon the existence of a constitutional violation by its officers."); *Denning v. Metro*, 2009 WL 1362489, *5 (6th Cir. May 12, 2009) (in a Fourth Amendment case, "because appellants have not established that there was an unconstitutional deprivation of Denning's constitutional rights, their claim of municipal liability necessarily fails."); *Watkins v. City of Battle Creek,* 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.") In light of this case law, the court did not err in instructing the jury that it could not consider Metro's Fourth Amendment liability unless it found a Fourth Amendment violation by one of the remaining officer-defendants.

### 1. "Collective" or "combined" action

In their reply in support of their Motion for New Trial, the plaintiffs clearly – as far as the court can tell, for the first time – offer the notion that "the collective actions of officers can be the cause of a constitutional injury and form the basis of a municipal claim even though no individual officer's actions rise to the level of excessive force." (Docket No. 624 at 1.) That is, the plaintiffs contend that the jury should have been instructed that Metro could be liable even if no individual officer was liable, so long as the jury found that the officers' "collective" conduct rose to the level of a constitutional violation. (*Id.*)

There is some support for this general proposition in the case law. The plaintiffs' primary support is from a concurring opinion by Judge Cole in a Section 1983 substantive due process case involving a high speed police chase accident, in which he states that he "read[s] *Heller* to prohibit municipal liability only when the victim suffers no constitutional injury at all, not when the victim fails to trace that constitutional injury to an individual police officer ... it is possible that no one individual government actor may violate a victim's constitutional rights, but that the 'combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.'" *Epps v. Lauderdale County*, 45 Fed. Appx. 332, 334-335 (6th Cir. 2002) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985)).

Also, *Bowman v. Corrections Corporation of America* was an Eighth Amendment case in which the Sixth Circuit noted that, in the procedural due process context, the Eighth Circuit had found that "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability." 350 F.3d 537, 546 (6th Cir.

2003)(quoting *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002)). The court in *Speer* concluded that the jury, in properly finding municipal liability, could only have found that some government actor(s), not the named defendant, had committed a constitutional violation. *Speer*, 276 F.3d at 986-87. The court in *Bowman* did not embrace or reject *Speer*, but noted that, because *Bowman* was a case in which the "constitutional violation claimed either occurred or did not occur as a direct result of the actions of at least one person," who was readily identifiable, "this is not a [case] in which the 'combined actions of multiple officials' could give rise to the violation at issue." 350 F.3d at 546-47.

Also, in Section 1983 cases involving deprivation of medical care or high speed pursuits (that is, not Fourth Amendment excessive force cases), at least two district courts in this Circuit have noted that there may arise circumstances in which the required underlying constitutional violation giving rise to municipal liability is a collective one, in which no one individual, identified officer committed a constitutional violation. *See Ford v. Grand Traverse County*, 2006 WL 3613292, *3 (W.D. Mich. Dec. 11, 2006); *Meals v. City of Memphis*, 2008 WL 701583, *3 (W.D. Tenn. Mar. 13, 2008).

While the plaintiffs' argument, given the facts of this case, is persuasive, ultimately it must be rejected with a mind to the procedural posture of this case. The plaintiffs are requesting that this court grant a new trial because the court erred in not instructing the jury that the jury could find a "collective" Fourth Amendment violation by the officers, even if no individual officer used excessive force – an instruction that the plaintiffs never tendered or even discussed.. Based on the string of settled Sixth Circuit case law discussed above, there is simply insufficient ground for such an instruction, let alone grounds for granting a new trial based upon the failure

9

to give it.  Also, it is not clear how a "collective" excessive force instruction would balance with the Sixth Circuit's previous admonition that, faced with an excessive force case that involves several uses of force, courts "must generally analyze the claims separately."  *See Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (internal quotation omitted).  Also, in the limited case law that the court can locate in which a plaintiff has attempted to advance a theory of "collective" excessive force, that theory has been rejected as unsustainable.  *See Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996).

Again, given the unique facts of this case, in which various officers combined to use a degree of force that, perhaps, the jury could have concluded was unreasonable, the theory that various officers, acting as a group, violated Lee's constitutional rights (thereby opening the door for potential municipal liability on the failure-to-train claim) is an arguably credible one.  That said, that is not the theory under which this case was tried, and, even if the plaintiffs had requested a "collective excessive force" instruction, which they did not, there is insufficient support in the case law to provide that instruction.   Therefore, the plaintiffs are not entitled to a new trial on this ground.[3]

_____

[3] In this general section of their Reply, the plaintiffs attempt to somehow resurrect their Fourteenth Amendment claim, which this court dismissed in summary judgment proceedings, as the plaintiffs had not provided any support for that claim, nor had they responded to any of the defendants' arguments challenging the plaintiffs' Fourteenth Amendment claims.  (See Docket No. 462 at 31.)  The plaintiffs now claim, however, that they raised a Fourteenth Amendment argument when they noted in their summary judgment response that "the due process clause imposes on a police officer the duty to intervene and protect a citizen from another's use of excessive force."  (Docket No. 624 at 3; Docket No. 400 at 24.)  While, as the plaintiffs concede, it was by no means clear from the plaintiffs' summary judgment response brief that the plaintiffs were advancing their Fourteenth Amendment claim through this argument, the court did consider the relevant precedent relied on by the plaintiffs in support of this proposition and found that it "involved a case with wholly different facts, in which the plaintiff was savagely beaten by police officers, some of whom the plaintiff could identify and some of whom he could not."  (Docket

C.       **Weight of the Evidence**

The plaintiffs argue that the "overwhelming weight" of the evidence presented at trial "showed that the defendant police officers used excessive force in their encounter with Patrick Lee," and, because of this, the court should grant a new trial as the verdict was against the weight of the evidence. (Docket No. 601 at 2.)  In deciding a motion for a new trial based on the proposition that the verdict is against the weight of the evidence, a trial court may compare and weigh the opposing evidence. *Conte*, 215 F.3d at 637.  It may not, however, set aside a jury's verdict simply because the court might have reached a different conclusion or might have drawn different inferences; the jury's verdict should be accepted if it "could reasonably have been reached." *Id.*  Also, determining "witness credibility is solely within the jury's province, and this court may not remake credibility determinations." *U.S. v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 343 (6th Cir. 1993); *Nartron Corp. v. Tuthill Corp.*, 2006 WL 2861858, *2 (E.D. Mich. Oct. 4, 2006).

At trial, the jury was provided with the following undisputed facts: during the altercation, Mays *activated* his taser device ten times, Scruggs *activated* his device nine times, and Cregan was positioned on top of Lee for a period of several minutes, at the end of which, Lee was turned over and was discovered to be unconscious.  The jury was also appropriately instructed that the excessive force standard is one of "objective reasonableness," that is, the jury should ask itself, considering all of the circumstances, from the perspective of a reasonable police officer on the scene, was the degree of force used objectively reasonable.  (See Docket No. 590 at 18-19; *Fox*

_____

No. 462 at 18-19.)  The court detects no error in its analysis of the plaintiffs' argument on summary judgment, and certainly nothing here that would warrant a new trial.

11

*v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007)).

### 1.    The taser activations

Based on the evidence presented at trial, the key issue with regard to whether the number of taser activations was "excessive" was whether the activations were "effective." That is, if the evidence presented at trial demonstrated that Lee, naked and unarmed, was effectively and knowingly tased ten times by Mays and nine times by Scruggs, it would be hard to view that amount of force as non-gratuitous and reasonable.

However, the evidence presented at trial would allow a reasonable factfinder to find that Lee was actually tased significantly fewer than nineteen times. Indeed, it is undisputed that, at certain points during the incident, the taser probes became detached from Lee's body (rendering any subsequent activation connected to that probe ineffective) and that the officers inadvertently shocked themselves. Plaintiff's counsel conceded that Lee was effectively tased fewer than nineteen times when he stated during closing argument that he felt that the evidence supported the notion that there were fourteen successful taser applications, six by officer Mays and eight by officer Scruggs.

Officer Mays testified, on the other hand, that his first taser activation incapacitated Lee, but, after Lee was able to quickly get up from that first activation, his next six activations had seemingly no effect on Lee. This testimony, that a "good" connection between the taser and Lee might have been lost following the first activation, was supported by the testimony of numerous officers, including officer Fisher, who testified that, as he arrived on the scene, he heard a loud "popping" or "cracking" noise, consistent with the noise made by a taser when it is being activated without an effective connection. After these seven activations, Mays testified that he

12

applied a brief drive stun to Lee's hip, before returning to his car, getting another taser cartridge, returning to the scene, and activating his taser toward Lee once more, without any effect, before, finally, shocking himself removing the second cartridge. Therefore, in post-trial briefing, Mays argues that "there was [] persuasive evidence that only the very first activation by Officer Mays resulted in the neuromuscular incapacitation of Mr. Lee." (Docket No. 609 at 3.) Moreover, the testimony was undisputed that, for each activation, Mays never ran the taser for more than the standard five-second cycle and that there was a considerable gap of eight to twenty-seven seconds between activations, all of which is consistent with an officer responsibly using the taser and assessing whether the activations were effective, rather than using the taser gratuitously.

Certainly, there was evidence presented at trial that contradicted this notion that Mays had only one effective taser application and that he used the taser reasonably. Most notably, the plaintiffs offered the testimony of eye witnesses such as Candace Coffee and Tracy Fitzgerald who, although they viewed the incident from some distance, testified that, during the initial stages of the confrontation (when Mays was the only officer using a taser), it appeared that the taser probe had been effectively launched and activations of the taser caused Lee to violently shake and fall down consistently and repeatedly.

There is no question that this eyewitness testimony was compelling. Ultimately, however, the jury's verdict as to officer Mays could "reasonably have been reached." There was considerable evidence presented that many of the taser activations performed by officer Mays were not "effective," and the jury apparently weighed the starkly contrasting testimony of the eyewitnesses to the scene and the officers on the scene, analyzed the credibility of the witnesses, and concluded that the officers' rendition of the events was more credible. On a motion for a

new trial based upon the weight of the evidence, it is not the court's place to "remake credibility determinations" or to replace a jury's reasonable verdict with the verdict that the court might find to be more reasonable. Therefore, the jury's verdict as to officer Mays will not be disturbed on this ground.

A similar analysis applies for officer Scruggs. At trial, Scruggs contended that, while he activated his taser nine times, far fewer than nine activations were actually effective. Scruggs claimed that his first taser activation lasted nine seconds, and that it was effective at incapacitating Lee. However, Scruggs testified that Lee quickly resumed his struggle with officers, and that his second taser activation was ineffective, as the taser wires got wrapped around a parked car (a Jeep), dislodging one of the leads. Thereafter, Scruggs returned to his car to obtain another cartridge, and Scruggs' third activation of the taser was an accidental pull of the trigger while he was at his car, loading his second taser cartridge.

Scruggs testified that, when he returned to the scene, he found Lee, between the parked Jeep and another vehicle, attempting to fight off officers. In response, he activated his taser four more times, he claims, with only two effective applications, and the final activation gave officers a chance to detain Lee and to keep him on the ground. After this point, Scruggs testified that he used his taser in drive stun mode two times to prevent Lee from continuing to struggle while the other officers subdued him, and only one of these drive stuns actually gained compliance from Lee, allowing another officer to handcuff him. That is, Scruggs testified that only four of his activations were actually effective and all were necessary to gain control of a crazed suspect who continued to fight with police through all of the taser activations and other attempts to gain compliance. Other officers on the scene, such as officers Mallery and Fisher, for the most part,

14

supported Scruggs's testimony that the taser activations were necessary to gain compliance from Lee.

The plaintiffs contend that Scruggs's actions after he returned with the second cartridge must be considered excessive force, because the record shows that Scruggs activated the taser six times in fifty seconds, during a period in which Lee was boxed in between two cars, and was, at times, sitting on the ground. (Docket No. 601 at 6.) Indeed, evidence was presented that Scruggs continued to tase Lee during this period, in part, because Lee would not comply with Scruggs's command to move from a sitting position to a lying position. (*Id.*) At trial, the plaintiffs also pointed out that Scruggs's description of the event had become significantly "cleaner" with time, that is, in his initial statements regarding the incident, Scruggs did not mention anything about ineffective trigger pulls during the important, final confrontation with Lee.

Again, the plaintiffs put forth compelling evidence here. That said, the jury's determination of whether Scruggs used excessive force depended on their evaluation of the credibility of the witnesses at trial. There is no way to know, for sure, whether Scruggs gratuitously tased Lee four times while Lee was seated or lying down, perhaps while in custody or almost in custody, or whether Scruggs fired the taser once, it worked, but Lee got up quickly, and then Scruggs needed to fire the taser three more times to gain one more effective application, which finally brought down Lee, a naked, confused, and out-of-control subject.

Again, if the jury believed Scruggs (and the other officers whose testimony lined up with Scruggs's testimony) the conclusion that Scruggs did not use excessive force "could reasonably have been reached." While he activated the taser nine times, his testimony was that the majority

15

of those applications were ineffective, and the ones that were effective were necessary to gain compliance from a suspect who continued to battle with officers, and, therefore, those applications were reasonable and non-gratuitous. Again, on a motion for a new trial based on the weight of the evidence, it is not the court's place to "remake credibility determinations" or to replace a jury's reasonable verdict with the verdict it might find to be more reasonable. Therefore, the jury's verdict as to officer Scruggs will not be disturbed on this ground.

        **2.**      **Officer Cregan**

The parties also submitted divergent descriptions as to the amount of force used by Officer Cregan. Cregan testified that, while he remained "over" Lee for several minutes (probably between 10-13 minutes), he was not applying a significant amount of force to Lee. Specifically, he claimed that, during this period, he was using "hard hand control" while in a "catcher's stance" with his knees on Lee's back and shoulder, to ensure that Lee remained on the ground, unable to escape, but also to ensure that Lee could still breathe comfortably.

In support of this position, Cregan offered the testimony of numerous officers, including Mallery and Smith, who testified that, during this period of restraint, Lee was conversational and never stated that he was having trouble breathing. These officers also testified that Cregan needed to contain Lee during this period because Lee continued to resist and to struggle following the tasering and being placed in handcuffs, and, therefore, the force used by Cregan to maintain control over Lee was not unreasonable. Also, defense medical expert Charles Wetli testified that, had Lee been deprived of oxygen by Cregan, Lee would have had broken blood vessels in his eyes, something that he apparently did not have on examination after the incident.

For their part, the plaintiffs focused on the fact that Cregan was applying force to Lee for

16

a period of at least ten minutes, and that Cregan, in his initial statements about the incident, had stated that he had "pinned" Lee to the ground. Again, the jury's assessment of whether Cregan used excessive force here came down to whether the jury believed Cregan and the other officers. If they believed their testimony, that is, that Lee was conversational and never complained about not being able to breathe, that Lee continued to struggle with Cregan and the other officers during this period, and that Cregan only used the amount of force necessary to hold Lee down and to prevent him from escaping, then the jury's conclusion that Cregan did not use excessive force could "reasonably have been reached." Again, these types of credibility determinations are the sole province of the jury, and the court will not disturb them.

For the reasons discussed above, the jury's verdict as to Mays, Scruggs, and Cregan could "reasonably have been reached," and, therefore, the court will not disturb that verdict as "against the weight of the evidence."

### D. Summary Judgment Dismissal of Other Officer-Defendants

The plaintiffs also seek to have the court reconsider its decision to dismiss seven individual officer-defendants (Smith, Scott, Wright, Mallery, Pinkelton, Brooks, and Fisher) at the summary judgment stage, arguing that the plaintiffs should have been allowed to bring these officers to trial based on a "failure to intervene" theory. (Docket No. 601 at 12.) In response, the defendants mostly argue that the plaintiffs' argument here should have been raised in a motion for reconsideration following the summary judgment Order and that the court should apply the "law of the case" doctrine and affirm its previous decision as to these officers. (See Docket No. 613 at 5-6.)

Setting aside any procedural defects with the plaintiffs' request, the court sees no viable

17

basis on which to reconsider its previous ruling as to the other seven officer-defendants. The

plaintiffs' argument that officers in this case could be liable under a "failure to intervene" theory

was raised at the summary judgment stage and was based largely on the same case law that the

plaintiffs cite here. At the summary judgment stage, the court rejected the "failure to intervene"

argument, because, among other things, this case law concerns situations in which officer

liability for failure to intervene arose in circumstances starkly different from this case, such as

where the relevant officer ordered another officer to engage in the impermissible conduct (and

then did not intervene to stop it) or the relevant officers did not intervene during the course of an

event such as a brutal beating or "summary punishment." *See Pierce v. City of Salem*, 2008 WL

4415407, *12 (D. Or. Sept. 19, 2008)(supervisory officer ordered and directed the use of the

taser and his "direction and control" could render him liable for the constitutional violations of

others); *Bruner v. Dunaway*, 684 F.2d 422, 424-26 (6th Cir. 1982)(raising possibility that

observing officers could be liable for a failure to intervene in the course of "severe,"

unprovoked, in custody "beatings" by police officers); *Byrd v. Brishke*, 466 F. 2d 6, 10 (7th Cir.

1972) (same, in the context of a case in which the plaintiff alleged that he was "summarily

punish[ed]" through a brutal beating by police officers in the back room of a Chicago bar). At

the summary judgment stage, the court concluded that this case law was not compelling based on

the facts of this case, and the plaintiffs, in simply reciting the same arguments and citing the

same law, have done nothing to sway the court on the issue.

### E. Evidentiary Objections

The plaintiffs also argue that the court erred in admitting or allowing five specific pieces

of evidence or argument at trial, that is, (1) "specific crimes and/or criminal charges on the part

18

of Patrick Lee"; (2) "the speculative testimony of Dr. Guillamondegui that Patrick Lee may have had mushrooms in his stool"; (3) the "improper argument[] by defense counsel" during closing that Lee was a "drug user, a trafficker, and a cultivator"; (4) "Taser Bulletin 14.0-03 dated April 28, 2008"; and (5) Dr. Levy's testimony "that the cause of Patrick Lee's death was excited delirium." (Docket No. 601 at 14-19.)

Even if the plaintiffs can show that the admission of the evidence or argument was in error, they are still not necessarily entitled to a new trial. Rather, Federal Rule of Civil Procedure 61 states that, "unless justice requires otherwise, no error in admitting or excluding evidence ... is ground for granting a new trial ... ." Fed. R. Civ. P. 61. That is, even if a trial court feels that it made an error in the admission of evidence, a new trial should not be granted unless "the [exclusion of] the evidence would have caused a different outcome at trial." *Tompkin v. Phillip Morris USA, Inc.,* 362 F.3d 882, 891 (6th Cir.2004); *United States v. Chambers,* 441 F.3d 438, 455 (6th Cir. 2006).

### 1.      Specific crimes and/or criminal charges on the part of Lee

While the plaintiffs concede that evidence of Lee's past drug use (through the admission of past crimes and charges evidence) was admissible for the purpose of establishing the pecuniary value of Lee's life under Tennessee law, they argue that the evidence should have been excluded under the Fed. R. Evid. 403 balancing.[4] The plaintiffs contend that "the repeated references to the drug use and [Lee's] arrests," prompted by the admission of this evidence,

---

[4]It is well known but worth noting that, despite the fact that evidence is relevant, it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

"were nothing more than an attack upon his character and a way to suggest to the jury that he must have died from excited delirium." (Docket No. 601 at 14-15.) The plaintiffs also contend that some evidence of Lee's drug use – such as the testimony that he had smoked marijuana with his father and the evidence that he had been charged, specifically, with the possession of 88 grams of mushrooms – simply did not bear on the pecuniary value of Lee's life. (*Id.*)

Although the call was close, the court continues to believe that it struck the right balance regarding the admission of this evidence. As the defendants point out, the court provided a limiting instruction about this evidence and did not allow the admission of certain evidence, such as a blood test done at the time of Lee's arrest in Kentucky, that might have shown the specific drugs that Lee was on, as those blood tests were too complex to be understood by the jury without the aid of protracted, distracting and unduly prejudicial expert testimony. (Docket No. 614 at 8.) Obviously, the balance here was a difficult one to strike, but, the alternative, to exclude the evidence of drug use, would have resulted in unfairness to the defendants, as the plaintiffs, while trying to recover for the pecuniary value of Lee's life, would have been able to gloss over acts of criminal conduct and lifestyle choices that certainly reflected on Lee's ability to honestly earn a livelihood. The court does not believe an error was committed here, and, therefore, this is not an appropriate ground for a new trial.

## 2. The testimony of Dr. Guillamondegui

At trial, Dr. Guillamondegui, an emergency room physician at Vanderbilt University Medical Center, testified that he observed, in Lee's post-admission bowel movement, what he perceived to be hallucinogenic mushrooms. While the plaintiffs contend that this testimony was "pure speculation" and did not meet the expert testimony requirements of *Daubert*, it is clear that

Dr. Guillamondegui made his observation based on his experiences dealing with a family member's drug problem, that is, based on his personal exposure, outside of the medical field, to this type of mushroom over the course of his life. Indeed, this testimony was "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge," and, therefore, the testimony was appropriate lay witness testimony. Fed. R. Evid. 701. Further, the plaintiffs had ample opportunity to cross-examine Dr. Guillamondegui and to have their experts opine that what Dr. Guillamondegui saw in Lee's stool could not have been this type of mushroom. (Docket No. 601 at 16.) Therefore, the court does not believe that it was an error to admit this testimony, and, even if it was, there was insufficient prejudice to warrant a new trial on this ground.

### 3. Allegedly improper closing arguments by defense counsel

The plaintiffs, without identifying the lawyer at issue, contend that the statement during defense closing argument that was, in essence, that Lee was a "drug user, a trafficker, and a cultivator" should not have been allowed, particularly because the evidence of Lee's past drug use was only supposed to be a factor that the jury considered when assessing the pecuniary value of Lee's life and, therefore, the statement was simply an unfairly prejudicial "attempt to appeal to the jury's prejudices and to put Mr. Lee on trial. It was nothing more than a personal attack against a young man that the defendants did not want the jury to like."[5] (Docket No. 601 at 17.)

---

[5] The defense closing argument as to the pecuniary value of Lee's life was presented by Mr. Harris, and, according to the court's notes and memory of the proceedings, he made the comments at issue.

Alleged misconduct during closing argument is only a basis for a new trial under limited circumstances. *Fuhr v. Sch. Dist. of the City of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004). The moving party must establish that the argument was not only improper but that the argument was so prejudicial that it likely influenced the jury's verdict. *Id.* When, as here, there was no objection to the argument during trial, the degree of prejudice required to be shown to warrant a new trial is raised. *Id.*

While there was evidence presented that Lee used and may have cultivated drugs, the specific statement that Lee was a drug "trafficker" – as that term is generally used to describe individuals who, for a career, move large quantities of drugs from place to place often in unseemly ways – seems, at least arguably, out of bounds. That said, it is hard to believe that the jury, which carefully listened to three weeks of testimony regarding this incident, would have been swayed by the isolated hyperbole of the defense counsel. Moreover, as defendant Scruggs points out, efforts to discredit parties in this case using loaded, arguably unsupported, language were not limited to defense counsel. (Docket No. 614 at 14.) Indeed, in his closing, plaintiffs' counsel used the term "torture" to describe what Scruggs did to Lee during the latter stages of the confrontation. (*Id.*) Therefore, while defense counsel's statement that Lee was a drug "trafficker" was not appropriate, the plaintiffs have not met their substantial burden of showing that the outcome of this litigation was influenced by the use of that language.

### 4. The admission of Taser Bulletin 14.0-03

The plaintiffs argue that the April 28, 2008 Taser Bulletin, which indicated Taser's position that the taser does not impair respiration, or cause metabolic acidosis or rhabdomyolysis, should not have been admitted because it was issued well after Lee's death and

22

only operated to put improper medical testimony, that is, Taser's opinion about the effects of the taser device, before the jury. (Docket No. 601 at 17-18.)

First, Mays and Metro argue, consistent with the court's recollection, that the plaintiffs specifically conceded to the admission of this evidence during the pre-trial conference. (See Docket No. 613 at 11.) Indeed, the court, over the defendants' pre-trial objection, allowed the plaintiffs to put the 2005 Taser Bulletin into evidence, which implied that excessive applications of the taser device could cause the medical consequences discussed above. The parties agreed, at the pre-trial conference that, in fairness to all sides, both bulletins should be admitted. Nothing that has occurred since convinces the court that this agreement between all parties was foolhardy, and, indeed, it would have been unfair for the plaintiffs to put forth the 2005 Bulletin as if it was Taser's final statement on the health consequences of the taser device.

### 5. Dr. Levy and excited delirium

In purely conclusory fashion, the plaintiffs re-assert their pre-trial position that the individual who performed the official autopsy in this case, the Medical Examiner of the State of Tennessee, Dr. Bruce Levy, should not have been allowed to testify that he determined the cause of Lee's death to be "excited delirium," because that diagnosis was "highly speculative" and "based upon very incomplete facts." (Docket No. 601 at 19.) As this court concluded pre-trial:

> Dr. Levy, as the Chief Medical Examiner for the State of Tennessee, is clearly qualified to render an expert opinion as to the cause of Lee's death. Further, his deposition testimony indicates that, just as the plaintiffs' four causation experts did, Dr. Levy applied the principles of differential diagnosis to arrive at the cause of Lee's death, which he concluded to be excited delirium. Dr. Levy considered many of the same issues that the plaintiffs' causation experts did, such as Lee's elevated CK and myoglobin levels, and he simply arrived at a different conclusion as to the relevance of those numbers, concluding that the elevated levels were likely caused by cardiac events and other issues related to the cause of Lee's

23

death, that is, the excited delirium.

It is true that, at the time of his deposition, Dr. Levy was not fully aware of the level of restraint applied to Lee after Lee was handcuffed, as Dr. Levy testified that Lee was "very quickly" moved off of his front once he was handcuffed, which is inconsistent with much of the testimony generated to date. That said, on further questioning, Dr. Levy indicated that, even if he had known that Lee had been face down for up to ten minutes, he would have reached the same conclusion, as, given Lee's youth and relative health, Lee's breathing would not have been impaired during the period that Lee was face down.

(Docket No. 550 at 17-18.) (internal citations omitted)

The plaintiffs had a complete opportunity to cross-examine Dr. Levy about his opinions and how he arrived at them. The plaintiffs have done nothing to persuade the court that its admission of Dr. Levy's testimony was incorrect; rather, as previously stated, "in light of Dr. Levy's qualifications and the well-established and accepted methodology by which he reached his conclusion, it would be clearly improper for this court to exclude his testimony under *Daubert*." (*Id.* at 18.)

###	F.	Summary

None of the grounds presented in the plaintiffs' motion warrant a new trial of this case. Therefore, for the reasons expressed above, the plaintiffs' Motion for New Trial will be denied.

## II.	Costs Motions

After the jury verdict in this case, Metro, under Fed. R. Civ. P 54(d), as a prevailing party, submitted its Bill of Costs, which asked that the Clerk of Court tax the plaintiffs $30,494.40 for the allowable costs that Metro accrued in defending itself and the officer-defendants in this case. (Docket No. 607.) The vast majority of these costs ($26,695.18) were court reporter and transcript costs, with the rest of the costs incurred in discovery productions

24

and court fees.  (*Id.*)  Apparently receiving no objections, on July 2, 2009, the Clerk taxed these costs against the plaintiffs.  (Docket No. 617.)

Likewise, on June 29, 2009, Taser filed its Bill of Costs, seeking, as a prevailing party under Fed. R. Civ. P. 54(d), $42,867.89 in costs, again, the majority of which ($26,251.78) consisted of court reporter costs, with smaller amounts ($15,831.60) for "copies of papers necessarily obtained for use in the case," medical examiner documents ($351.60) and witness fees ($432.91).  (Docket No. 611.)  Invoices, exhibits, and affidavits were provided by both Metro and Taser in support of their submissions, and the plaintiffs do not contend that these fees were not actually incurred.

On July 6, 2009, the plaintiffs filed two motions asking that the court review the Bills of Costs submitted by Metro and Taser respectively.  (Docket Nos. 619 and 621.)  The motions are almost identical, with the plaintiffs arguing that the court should exercise its discretion and not tax costs against the plaintiffs here because an award of costs would have a "chilling effect ... on future litigants in similar civil rights cases, " and because the plaintiffs pursued their case in "good faith" and because the case was a "close and difficult one."  (Docket No. 620 at 3 and Docket No. 622 at 3.)  The plaintiffs also claim that Taser engaged in "dump truck discovery," producing numerous copies of unnecessary materials, and, therefore, Taser's cost award should be reduced even if the court is not inclined to reduce or eliminate it on other grounds.  (Docket No. 622 at 4.)

Fed. R. Civ. P. 54 states that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d).  The Sixth Circuit has concluded that "this language creates a

presumption in favor of awarding costs, but allows denial of costs at the discretion of the trial court." *Knology v. Insight Communications Co. LP*, 460 F.3d 722, 726 (6th Cir. 2006). That is, the "rule establishes a norm of action: prevailing parties are entitled to their costs as of course. Departures from the rule are permitted; however, when rules prescribe a course of action as the norm but allow the district court to deviate from it, the court's discretion is more limited than it would be if the rule were nondirective." *White & White v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 731-32 (6th Cir. 1986)(internal quotation omitted).

The Sixth Circuit has identified "several factors a losing party may put forward that may be sufficient to justify a district court in overcoming the presumption in favor of a cost award." *Knology*, 460 F.3d at 726. (internal quotation omitted). The factors advanced by the plaintiffs here – chilling effect, the closeness and the difficulty of the case, and the losing party's good faith, are all valid considerations for the court to consider in deciding whether to award costs under Fed. R. Civ. P. 54(d). *White & White.*, 786 F.2d at 730. "The good faith of unsuccessful litigants is a relevant consideration in Rule 54(d) deliberations. Good faith without more, however, is an insufficient basis for denying costs to a prevailing party." *Id.* at 731. As to "closeness" and "difficulty," not only are the sheer number of trial days, exhibits, witnesses, and depositions to be considered, but "the closeness of a case is [also] judged not by whether one party clearly prevails over another, but by the refinement of perception required to recognize, sift through and organize relevant evidence, and by the difficulty of discerning the law of the case." *Id.* at 732-33. Finally, "chilling effect" is a relevant consideration, along with "all the circumstances of the case," in determining whether the award of costs is equitable. *Id.* at 733. Numerous district courts in this circuit have considered the potential chilling effect on future,

similarly situated litigants to be a valid reason, among others, to decline to award costs. *See e.g. Barber v. Overton*, 2005 WL 2018134, *1 (W.D. Mich. Aug. 20, 2005); *Pickens v. GLR Constructors, Inc.*, 196 F.R.D. 69, 77 (S.D. Ohio 2000).

The plaintiffs make a compelling case that costs should not be awarded to the defendants here. Under the standard discussed above, this case was extremely "close" and extremely "difficult." Indeed, the "refinement of perception required to recognize, sift through and organize relevant evidence" was enormous, and, while numerous parties were dismissed at the summary judgment stage, the fact that those parties had no liability only became clear through arduous and voluminous discovery. As to the defendants that remained in the case, the trial was certainly "close" and "difficult." The trial consumed fifteen court days, and had dozens of witnesses, many of whom testified as to extremely complex and difficult medical and scientific topics. And, as discussed herein, there was substantial evidence in support of the plaintiffs' claims. This was truly a "close" and "difficult" case.

Also, there is a clear "chilling effect" that would come from an award of costs in this context. There can be no doubt that parents in the same position as the plaintiffs would be "chilled" or "made to think twice" about protecting their rights and the rights of their deceased children in complex cases if they believed that, at the end of their unsuccessful but very legitimate lawsuit, they could be slapped with a nearly six-figure bill for the costs incurred by the defendants in defending the case. Plainly, given the amount of costs incurred here, an award of costs to the defendants would have a profound chilling effect on the very litigants who should be bringing claims – those with legitimate and detailed arguments that their civil rights have been violated.

27

Finally, there can be no question that the plaintiffs acted in good faith here. While Taser and Metro argue that the plaintiffs maintained non-viable claims for too long in this litigation and sued defendants who ended up having no liability, the court sees no evidence that the plaintiffs did not act in good faith. Given the circumstances giving rise to this litigation, it was entirely reasonable for the plaintiffs to sue all of the officers involved and Taser, and the non-viability of the claims against those who were dismissed from this case pre-trial, as noted above, only became clear through intense, arduous discovery.

Given the court's discretion in this area and all of the circumstances of this case, the court refuses to award costs to Metro and Taser. Each party will bear their own costs in this extremely difficult, trying and expensive litigation.[6]

### III.    Motion to Interview Jurors

After the verdict, but prior to the filing of any post-trial briefing, the plaintiffs and Metro jointly moved, pursuant to Local Rule 39.01(f)(2), for leave to interview the jurors in this case. Metro stated that it wished to interview the jurors to gain their impressions of the relevant aspects of Metro's training, because, as discussed above, the jury did not have an opportunity to express an opinion on that training, despite hearing a large amount of testimony about it. (Docket No. 598.) Metro argues that it could improve its training program, thereby better

---

[6]Metro also argues that the plaintiffs did not follow the proper procedure for opposing a bill of costs, because they did not submit written objections to Metro's bill of costs to the Clerk, before challenging the costs awarded by the Clerk here. (Docket No. 623 at 2.) Contrary to Metro's argument, the court does not read the relevant local rule to require that the losing party file objections with the clerk as a prerequisite to seeking review of the clerk's award in this court. See Local Rule 54.01. Moreover, Metro cites no support for the notion that the court lost its authority to review costs because of the procedure that the plaintiffs followed. In short, this argument is without merit.

serving and protecting the citizens of Nashville and Davidson County, if it could gain an understanding of the jury's perception of the program. (*Id.*) The plaintiffs joined in the request to interview the jurors, but they did not state why, specifically, they sought to interview the jurors in this case, only stating that the interviews would not be used for purposes of intimidation or harassment. (Docket No. 599.)

Local Rule 39.01(f)(2) states that "no attorney, party, or representative of either may interrogate a juror after the verdict has been returned without prior approval of the court. Approval of the Court shall be sought only by an application made by counsel orally in open court, or upon written motion which states the grounds and the purpose of the interrogation. If a post-verdict interrogation of one or more members of the jury should be approved, the scope of the interrogation and other appropriate limitations upon the interrogation will be determined by the Judge prior to the interrogation." Local Rule 39.01(f)(2).

The decision whether to allow attorneys to interview jurors after a trial lies in the sound discretion of the trial judge. *Holmes v. Telecheck Int'l, Inc.*, 2008 WL 687098, *1 (M.D. Tenn. Mar. 10, 2008) (citing *Wilkerson v. Johnson,* 699 F.2d 325, 330 (6th Cir.1983)). Generally, post-trial interviews of jurors are disfavored in the federal courts, because they "invade the province of the jury room" and encourage "fishing expeditions" in search of information to "impeach jury verdicts." *Id.* (citing *Tschira v. Willingham,* 135 F.3d 1077, 1089 (6th Cir.1998)).

Plainly, the plaintiffs' request is unjustified because, although it states that the plaintiffs will not use any interviews for the purposes of harassment and intimidation, the plaintiffs do not provide the "grounds and the purpose of the interrogation," and, therefore, the request does not comply with the requirements of the Local Rule. While Metro's motion does provide the

29

grounds and purpose, and they are certainly reasonable, Metro's request will be denied for the moment. The jury would operate as a reservoir of information and insights about Metro's training program, and information provided by the jurors could inappropriately influence any appellate briefing in this case. Therefore, the court will deny this motion, without prejudice. The parties may re-file this motion when this case concludes.

## **CONCLUSION**

For the reasons discussed herein, the plaintiffs' Motion for New Trial will be denied, no costs will be awarded to Metro and Taser in this case, and the parties' Motion For Leave to Interview the Jurors in this case will be denied, without prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge